**Paul L. WILLIAMS, Anthony L. Young, and Miguel Del Valle, Plaintiffs,**

v.

**STATE BOARD OF ELECTIONS, et al., Defendants.**

**No. 88 C 2377.**

United States District Court, N.D. Illinois, E.D.

Aug. 4, 1988.

Michael P. Seng, John Marshall Law School, Chicago, Ill., James C. Craven, Springfield, Ill., for plaintiffs.

Richard M. Daley, State's Atty., Terry McDonald, Asst. State's Atty., Supervisor, Federal Litigation Unit, Michael Levinson, Chicago Bd. of Elections, Mike Hayes, Roger P. Flahaven, Deputy Attys. Gen., Barry T. McNamara, D'Ancona & Pflaum, James J. Stamos, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, Chief Judge.

### FACTS

In Illinois, voters directly elect judges at all three levels of the state court system. The highest court is the Illinois Supreme Court which is composed of seven justices, one each from four downstate Illinois judicial districts and three from the First Judicial District, which consists of Cook County. Cook County includes the City of Chicago and its neighboring suburbs. The voters of the First Judicial District select their three Illinois Supreme Court justices for ten year terms on an at-large basis.

The intermediate-level court is the Illinois Appellate Court. A branch of this court sits in each of the state's five judicial districts. In the First Judicial District, voters elect at-large their 21 appellate court judges, who serve ten year terms. In addition to these 21 elected judges, three judges have been appointed to the court.

The trial-level court in the First Judicial District is the Circuit Court of Cook County. Of the 177 Circuit Court judges, 94 are chosen in at-large county-wide elections. Chicago voters elect another 56 in at-large elections held within the city. Suburban Cook County voters choose the remaining 27 judges in at-large elections held in the area of Cook County outside Chicago. All Circuit Court judges serve six-year terms.

Once a Supreme Court, Appellate Court, or Circuit Court judge has served a full term, he or she need not run again in a competitive election. Six months prior to the expiration of his or her term, a judge can request certification for a non-partisan retention election. If sixty percent of the electorate votes to retain the judge, the judge is elected to another term.

In addition to those judges directly elected by the voters, there is another category of judges who serve in Cook County, the Associate Circuit Court judges. The 170 Associate Circuit Court judges are appointed by vote of the regular Circuit Court judges. These Associate Circuit Court judges serve four-year terms and may seek retention. If sixty percent of the Circuit Court judges support an Associate's bid for retention, the Associate is reappointed for another term.

The named plaintiffs in this case represent a class of black and Hispanic citizens of voting age who reside in Cook County. In an order dated July 20, 1988 we broke this class into two subclasses: blacks and Hispanics. The plaintiffs challenge the at-large system for electing Supreme Court, Appellate Court, and Circuit Court judges, as well as the appointment system for selecting Associate Circuit Court judges. Plaintiffs argue that the at-large system dilutes their voting strength, thereby denying them the opportunity to elect judges of their choice as guaranteed by the Voting Rights Act, 42 U.S.C. § 1973.

In support of their claim, the plaintiffs make the following allegations, which we take as true on this motion to dismiss. First, they allege that blacks and Hispanics are "geographically compact and politically cohesive" minority groups.[1] Furthermore, according to plaintiffs, "[e]lections in Chicago and Cook County, including the election of judges, are marked by a high degree of racially polarized voting." *Id.* at ¶ 16. In this political environment, plaintiffs argue that Illinois' at-large judicial election scheme results in the dilution of minority votes.

In support of their vote dilution claim, the plaintiffs point to the following statistics and election results. The population of Cook County is 66.8 percent white (3,511,803), 25.6 percent black (1,346,464), and 9.5 percent Hispanic (499,322).[2] Yet, no black or Hispanic has ever been elected to the Illinois Supreme Court from the First Judicial District. In addition, of the 24 judges currently serving on the Illinois Appellate Court in the First Judicial District, only six are black and none are Hispanic.

As noted above, Circuit Court judges are selected in county-wide, city-only, and suburbs-only elections. Unfortunately, plaintiffs do not describe the racial breakdown of the judges by their respective electorates. Nevertheless, of all the Circuit Court judges, 159 are white (87.8 percent), 21 are black (11.6 percent), and one is Hispanic (.5 percent). Also, the plaintiffs note that the City of Chicago is composed of 1,490,216 whites (49.6 percent), 1,197,000 blacks (39.8 percent), and 422,063 Hispanics (14 percent).[3]

Plaintiffs also allege that "campaigns in Chicago and Cook County are often characterized by overt or subtle racial appeals," *id.* at ¶ 16; that blacks and Hispanics have been denied access to the slating process for judicial candidates, *id.* at ¶ 18; and that in all judicial elections Illinois employs a majority vote requirement and prohibits single-shot voting, *id.* at ¶¶ 19, 20.

As relief, the plaintiffs ask that we abolish the at-large judicial election system in Cook County and replace it with a single member district scheme or, in the alternative, with a small multi-member district system. Moreover, the plaintiffs request that we declare vacant all Associate Circuit Court judgeships and "order [that they] be filled pursuant to [Illinois] Supreme Court Rule 39, but from the same single-member or multi-member districts used for the election of circuit judges."

DISCUSSION

Defendants' motion to dismiss raises several important issues.

I. *Whether Section 2 of the Voting Rights Act (42 U.S.C. § 1973) Applies to Elected Judges*

Defendants do not contest plaintiffs' claim that Section 2 of the Voting Rights

---

1. The complaint refers only to the "minority population," including both blacks and Hispanics. However, from this allegation, we can reasonably infer that each subclass is geographically compact and politically cohesive.

2. These are the plaintiff's percentages. They add up to more than 100%.

3. See *supra* note 2.

Act, 42 U.S.C. § 1973, applies to judicial elections. This concession seems appropriate: although the question is one of first impression in this circuit, the weight of authority leans in favor of it. *See Chisom v. Edwards,* 839 F.2d 1056 (5th Cir.1988) (Johnson, J.) (§ 2 applies to elected state judges); *Mallory v. Eyrich,* 839 F.2d 275 (6th Cir.1988) (same); *see also Martin v. Allain,* 658 F.Supp. 1183, 1200 (S.D.Miss. 1987) (§ 2(a) applies to elected state judges). *But see Chisom v. Edwards,* 690 F.Supp. 1524, 1531 (E.D.La.1988) (representation by counsel for state defendants that they will seek certiorari on applicability of § 2 to judges), *stay pending appeal granted sub nom. Chisom v. Roemer,* 850 F.2d 1051, 1988 W.L. 76333 (5th Cir.1988).

II. *Whether the Plaintiff Subclasses Have Stated Claims for Vote Dilution Under the Voting Rights Act*

In order to state a claim for vote dilution under the Voting Rights Act, minority plaintiffs must meet the three preconditions set forth in *Thornburg v. Gingles:*[4]

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the multimember form of the district cannot be responsible for minority voters' inability to elect its [sic] candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ... usually to defeat the minori-

ty's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986) (footnotes and citations omitted).

▮ As far as the first precondition, the subclass of blacks is geographically compact and clearly numerous. Complaint at ¶ 17. If we drew single-member districts for Supreme Court, Appellate Court and Circuit Court elections, then blacks could easily form a majority in at least one district for each office. On the other hand, the subclass of Hispanics is not sufficiently numerous to form a majority in a single-member Supreme Court district. According to the plaintiffs' own figures, 875,610 persons are required to form a majority in a Supreme Court district. The total Hispanic population in Cook County is only 499,322. Therefore, we must dismiss Count I as to the Hispanic subclass. Of course, should single-member districts be drawn for Appellate Court and Circuit Court elections, the Hispanic subclass is large enough to constitute a majority within at least one district for each office.

With respect to the second precondition, the allegations contained in the plaintiffs' complaint are clearly sufficient. *See* Complaint at ¶ 17 ("The minority population in Cook County is a ... politically cohesive population"). The third precondition, however, requires more complicated analysis. We must assess each subclass's ability to show that racial bloc voting prevents it from electing candidates of its choice to the judicial offices at issue here.

A. Black Vote Dilution in Supreme Court Elections, Hispanic Vote Dilution in Appellate Court Elections, and Black and Hispanic Vote Dilution in Circuit Court Elections

▮ Under the third *Gingles* precondition, each subclass must allege "that white

---

4. The plaintiffs have also made other allegations which, if proved, would tend to show that the at-large judicial election system violates Section 2 of the Voting Rights Act. However, as the Seventh Circuit has recently held, these factors indicating discrimination, without more, are insufficient to state a vote dilution claim under *Gingles. See McNeil v. Springfield Park District,* 851 F.2d 937, 942 (7th Cir.1988).

bloc voting usually thwarts election of the minority's preferred candidate." *McNeil v. Springfield Park District*, 851 F.2d 937, 942 (7th Cir.1988). With respect to the blacks' claim of vote dilution in Supreme Court elections, the Hispanics' claim in Appellate Court elections, as well as both blacks' and Hispanics' claims in Circuit Court elections, the plaintiffs essentially rely upon three allegations [5] to meet the third *Gingles* precondition. They allege: (1) the operation of an at-large election system; (2) the existence of "racially polarized" voting; and (3) the failure of blacks and Hispanics to be elected in representative numbers.[6]

From the plaintiffs' allegation of "racially polarized" voting we can easily infer that whites vote as a bloc and vote differently than blacks or Hispanics. To infer, though, that the white bloc usually prevails in judicial elections is more difficult. The fact that blacks and Hispanics have not been elected in representative numbers does not alone violate the Voting Rights Act. In fact, Section 2 provides that "nothing in [the Act] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). As the Supreme Court made clear in *Gingles*, the proper inquiry is whether minorities have been denied the opportunity to elect candidates *of their choice.* 478 U.S. at 51, 106

S.Ct. at 2767. Consequently, in order to prevail on their Section 2 claim, plaintiffs must prove that black and Hispanic voters cannot elect their choices, *i.e.*, that their choices regularly lose elections.

Nevertheless, on this motion to dismiss, we make all reasonable inferences in favor of the plaintiffs. Thus, we reasonably infer from the absence of black judges on the Supreme Court, the absence of Hispanics on the Appellate Court, as well as the relative lack of blacks and Hispanics on the Circuit Court, that blacks and Hispanics have been unable to elect their preferred candidates to these judicial offices.

In sum, we deny the defendants' motion to dismiss Count I as to blacks, Count II as to Hispanics, and Count III as to both subclasses. We grant the motion to dismiss Count I as to Hispanics, and address in the next section the motion to dismiss Count II as to blacks.

### B. Black Vote Dilution in Appellate Court Elections

■ Whether the black subclass has stated a claim for vote dilution in Appellate Court elections presents a very close pleading question. The number of black Appellate Court judges (six of 24 are black) roughly reflects the percentage of Cook County residents who are black (25.6 per-

---

5. Plaintiffs also allege that there is an illegal slating process. Complaint at ¶ 18. If a racially discriminatory slating process exists, then plaintiffs may be able to state a Voting Rights Act claim on that basis alone. In their complaint, plaintiffs state only that "[t]here is a slating process for judicial candidates in Cook County. Plaintiffs have been denied access to the slating process, and have thereby been denied access to the political process." *Id.* This allegation is simply insufficient. It neither describes the process in any meaningful way nor states the reason that the plaintiffs believe they have been denied access to it.

6. Through our own calculations, based on the bare figures provided in the plaintiffs' complaint, we have concluded that blacks are underrepresented on the Supreme Court (0 percent of the court is black while 25.6 percent of electorate is black) and the Circuit Court (11.6 percent of the court is black while 25.6 percent of electorate is black), and that Hispanics are un-

derrepresented on the Appellate Court (0 percent of the court is Hispanic while 9.5 percent of the electorate is Hispanic) and the Circuit Court (0.5 percent of the court is Hispanic while 9.5 percent of electorate is Hispanic). We note that blacks may be barely underrepresented in city-only Circuit Court elections. If we assume that all 21 blacks who now serve on the Circuit Court were elected from Chicago, they would account for 37.5 percent of the Circuit Court judges selected in Chicago-only at-large elections. Blacks constitute 39.8 percent of the City's population.

We note that the figures supplied by the plaintiff are not the best. For example, some percentages are incorrect, and some do not add up to 100. Nevertheless, they suffice for this motion to dismiss. We caution plaintiffs that, in order to prevail, they will need to present accurate statistics broken down into relevant categories (e.g., Circuit Court election results sorted by city-only, suburb-only, and county-wide elections; voting age population statistics).

cent). Therefore, unlike in the cases of Supreme Court and Circuit Court judges, we cannot infer from the underrepresentation of blacks on the Appellate Court that the black subclass has been prevented from electing its preferred candidates. By the same token, though, the roughly proportional presence of blacks on the Appellate Court does not necessarily mean that the choices of the black subclass are in fact being elected. The blacks who are currently serving on the Appellate Court may not be the choice of the black subclass.[7] On this close issue, we hold that one can reasonably infer from the complaint that plaintiffs claim the current black Appellate Court judges are not the choices of the black subclass. Therefore, we hold that the black subclass states a claim for vote dilution in Appellate Court elections.

In addition, we note that, even if it turns out that the black Appellate Court judges are in fact the choices of the black electorate, *Thornburg v. Gingles, supra,* does not absolutely foreclose the subclass's ability to bring a vote dilution claim. The Supreme Court has acknowledged that "special circumstances" may explain minority candidate success in an illegal at-large system and that, in such cases, minorities can maintain vote dilution actions. *Gingles,* 478 U.S. at 57, 106 S.Ct. at 2770. "Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election." *Id.* Because the complaint does not include Appellate Court election results over time, we cannot say with certainty that the presence of black judges represents "sustained [electoral] success," precluding the subclass from bringing a Section 2 action. *Gingles,* 478 U.S. at 77, 106 S.Ct. at 2780.

### III. *Whether the Voting Rights Act Applies to the Selection of Associate Circuit Court Judges*

■ The plaintiffs ask that we declare vacant all Associate Circuit Court judge-ships, arguing that the current Associate Circuit judges were appointed by judges elected under an illegal at-large system. In order to determine whether the Act covers Associate Circuit Court judges, we turn first to the text of the statute. The Voting Rights Act provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States *to vote* on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to *elect* representatives of their choice.

42 U.S.C. § 1973 (emphasis added).

By its very terms, the Act extends only to mechanisms involved in the election of representatives. However, the people of Cook County do not elect the Associate Circuit Court judges; they are appointed by the regular Circuit Court judges. Because Associate Circuit Court judges are not elected representatives of the people within the plain meaning of the Act, we hold that the plaintiffs cannot challenge the appointment of Associate Circuit Court judges. Though the plaintiffs contend that full relief requires reappointment of all Associate Circuit Court judges by properly elected Circuit Court judges, we cannot extend coverage of the Voting Rights Act beyond its terms. The Voting Rights Act

---

7. This does not mean that we believe, or think that the plaintiffs' representatives believe, that any member of the Illinois Appellate Court does

not fairly and honorably serve the black community as well as all citizens of Cook County.

covers elected officials only. Associate judges are appointed officials.

Our holding makes practical sense. If we held that the Act reached all appointments made by a judge elected under an illegal at-large system, then an elected judge's appointment of a trustee, guardian or receiver would come under the Act. We do not believe that Congress intended this result when it passed the Voting Rights Act.

In sum, we dismiss all claims challenging the selection system for Associate Circuit Court judges. We also dismiss all claims against Samuel Conti, who was joined solely because of his role in the Associate Circuit Court judges' appointment process.[8]

### IV. *Whether the Complaint States a Claim Against the State Board of Elections*

■ We deny the motion to dismiss the complaint against defendant State Board of Elections. Plaintiffs allege that the State Board has a "role" in the conduct of at-large elections. Complaint at ¶ 10. *Cf.* ILL.ANN.STAT. ch. 46, ¶ 10–6 (Smith–Hurd. Supp.1988) (role of Board of Elections in certifying candidates). At this stage in the case, we must assume that the State Board could be a necessary party, and that its presence in this suit may be necessary in order to order full relief. FED.R.CIV.P. 19(a)(1). "A state officer [and, we presume, a state agency] may be named as a party defendant provided such officer has some connection with the enforcement of the statute in question, which connection may be created by the statute itself or may arise out of the general law. *Ex parte Young*, 209 U.S. 123, 156–58 [28 S.Ct. 441, 452–53, 52 L.Ed. 714] ... (1908)." *Partido Nuevo Progresista v. Hernandez Colon*, 415 F.Supp. 475, 477–78 (D.P.R.1976) (three-judge court) (per curiam). We note the State Board of Election's argument that the county officers election board has true responsibility for election disputes,

ILL.ANN.STAT. ch. 46, ¶ 10–9 subd. 2 (Smith–Hurd.Supp.1988). Plaintiffs should consider whether they wish to join the county officers election board. If the State Board wishes to pursue its argument that it in fact has no authority in this area, it should move for summary judgment.

### V. *Whether the Plaintiffs Have Failed to Join Necessary Parties*

Defendants argue that the plaintiffs have failed to join two sets of necessary parties: (1) associate judges; and (2) persons who are candidates in the November 1988 judicial election that the plaintiffs seek to enjoin. Federal Rule of Civil Procedure 19(a) defines who is a necessary party to a lawsuit:

(a) **Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

As we are dismissing the portion of the complaint relating to associate judges, *see*

---

**8.** The parties have not addressed the status of the three appointed Appellate Court judges. Their status may raise issues similar to those discussed in the text. We also note that at least

one member of the Illinois Supreme Court from the First Judicial District currently serves by appointment.

*supra* pp. 1568–69, they are obviously not necessary parties. Whether other persons should be joined is more complicated.

## A. Candidates for Judicial Office

■ As candidates for judicial office in Cook County are not now parties and have not sought to intervene, the court must impute interests to them in order to determine whether their interests rise to a level that would make them necessary (or even indispensable) parties to this action. *See Bradley v. School Bd. of Richmond, Va.,* 51 F.R.D. 139, 141 (E.D.Va.1970). The task of imputing interests to absent persons is not made easier by the cursory briefing accorded the issue by both movants and respondents. We are forced, therefore, to work largely from what is judicially noticeable: Sitting judges seeking retention must file a declaration of candidacy to succeed themselves not less than six months before the general election preceding the expiration of the judge's term of office. ILL. CONST. Art. 6, § 12(d). Most, if not all, candidates for vacant judgeships have already won a party primary.[9] We do not decide today whether these candidates or other persons have a property or due process interest in their right to stand for election at a particular time. Nor do we decide whether these or other persons have any type of right to run for office from an electoral district of a particular size or of a particular shape. Plaintiffs seek, at almost the eleventh hour, to enjoin an election for which candidates have already been nominated. We hold that, under the circumstances of this case, those candidates have at least a colorable interest in the timing of that election. *See Chisom v. Roemer,* 850 F.2d 1051, 1054 (5th Cir.1988) (Johnson, J. dissenting) (order staying injunction pending appeal) ("it is particularly unfair to expect candidates to expend the large sums of money and energy necessary to effectively campaign ... in an atmosphere im-

bued with confusion and uncertainty among the voters...."). It seems reasonable that some or all of these candidates could "claim[ ] an interest relating to the subject of the action." FED.R.CIV.P. 19(a)(2). If so, "disposition of the action in the[se] person[s'] absence may ... as a practical matter impair or impede the[se] person[s'] ability to protect that interest." *Id.* We hold therefore that the candidates for judicial office in the upcoming election are necessary parties to this action.

Rather than dismiss the case under FED. R.CIV.P. 12(b)(7), we will order the plaintiffs to join all candidates in the upcoming November election for any judicial office in Cook County or any part of Cook County. FED.R.CIV.P. 19(a), 21. Plaintiffs are ordered to join candidates who have been nominated by a party within 14 days, and to join any other candidates within two weeks of their names being officially certified for the ballot.[10] Plaintiffs are given leave to amend their complaint accordingly.

## B. Sitting Elected Judges

Our inquiry does not end there. Although defendants have not raised the issue, we note that most sitting judges, elected from Cook County or part of it, may also claim interests which could be affected by this case. The complaint asks us to "[o]rder the Defendants to adopt and place into effect for the next scheduled election, electoral structures providing for the election of *all* judges from single-member districts; or, in the alternative, for Appellate Court and Circuit Court judges, from small multi-member districts which will still provide plaintiffs with an equal opportunity to elect judges of their choice." Complaint at ¶ 49(c) (emphasis added). In addition, plaintiffs ask for all "just and equitable relief." *Id.* at ¶ 49(e). In effect, the plaintiffs ask us to declare all judgeships in the First Appellate District vacant or to terminate

---

9. The candidates' roster may not be final until 92 days before the election. *See* ILL.ANN.STAT. ch. 46, ¶ 10–6 (Smith–Hurd.Supp.1988) (nomination paper to be filed 99 to 92 days before election).

10. We note, however, that although candidates for judicial office in Cook County are necessary

parties to this action, they are not indispensable parties. *See Toney v. White,* 476 F.2d 203, 207 (5th Cir.), *modified on other grounds,* 488 F.2d 310 (5th Cir.1973) (en banc). Therefore, the action may proceed even if plaintiffs are unable to serve some candidates.

them prematurely, and to order a special election, or an expanded ballot at a regularly scheduled election, to fill those vacancies or expected vacancies.

We cannot now rule out the possibility that we would consider such a request were plaintiffs to prevail, because "in a voting rights discrimination context, ... 'the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Ketchum v. Byrne,* 740 F.2d 1398, 1412 (7th Cir.1984) (quoting *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, (1965)), *cert. denied sub nom; City Council of the City of Chicago v. Ketchum,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). *See Chisom v. Edwards,* 690 F.Supp. 1524, 1537, 1988 W.L. 70055 at 26, 45 (E.D. La.1988) (collecting cases in which courts have shortened terms of illegally elected officials and citing 5th Circuit dictum, in unpublished order dated May 22, 1988, that such relief might be appropriate).

If plaintiffs prevail, and we were to declare all existing judgeships vacant or truncate the terms of sitting judges, it would drastically reduce the tenure of most sitting judges who are elected from Cook County: Supreme and Appellate Court judges are elected for terms of ten years, and Circuit Court judges for six years. ILL. CONST. Art. 6, § 10. Most of them would not ordinarily be candidates for retention in the next election. If these judges have a property or other due process interest in retention of their office—or in their preferential treatment when running for retention—then under FED.R.CIV. P. 19(a)(2) they, too, are necessary parties in this case.

There are remarkably few cases which discuss the nature of an elected public official's interest in his continued tenure in office, and even fewer cases discussing this interest when the elected official is a sitting judge. However, the Supreme Court defined a person's interest in continued public employment—as a university professor—as follows:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it....

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Were elected judges ordinary public employees, with rights specified by law or contract, they would have at least a due process right to some kind of hearing before losing jobs in which they had a legitimate expectation of continuation in office. *See generally Developments in the Law: Public Employment,* 97 HARV.L.REV. 1611, 1780–1800 (1984). Judges are not ordinary public employees. Nevertheless, it is evident that, under the test set out in *Roth, supra,* sitting elected judges, whose terms of office are set by the Illinois Constitution, could base their claim to continued tenure in office on "existing rules or understandings."

The plaintiffs nonetheless offer an argument that Illinois judges' special status as elected officials divests them of any interest in the outcome of this case:

Candidates and officeholders have no interest relating to the subject matter of this case, and complete relief can be afforded to plaintiffs without joinder of those parties. Candidates and officeholders cannot affect the structure of the system in which they are elected (or strive to be elected). Their interest is limited to the opportunity to run for office or to hold office in a system which complies with federal and state constitutional and statutory requirements. In this challenge to the underlying electoral

structure, they have no justiciable interest.
*Plaintiffs' Response to State Defendants' Motion to Strike and Dismiss at 10.* This argument begs the question. The first order of business in this case is to determine *whether* sitting judges were illegally elected. Until such time as the court might make such a determination, sitting elected judges have at the very least a colorable claim to their office. Further, even if the plaintiffs should prevail, these judges may have an equitable interest in the timing and nature of the relief to be ordered by the court, if only because many of them are likely to be candidates for election or retention even if their offices are declared vacant or their terms of office are truncated.

In any event, until the court has ruled on the merits of the plaintiffs' claims, sitting judges have more than a passing interest in their continued tenure in office. The few courts that have examined the issue have held that judges who are threatened with removal before the natural expiration of their term have an interest in their continued tenure in office sufficient to require that they receive due process before it is taken away. *See Halleck v. Berliner*, 427 F.Supp. 1225, 1247 (D.D.C.1977) (holding that judge of the Superior Court of the District of Columbia was entitled to greater due process safeguards in disciplinary proceedings than he was entitled to in a retention proceeding); *In Re Nowell*, 293 N.C. 235, 237 S.E.2d 246, 251 (1977) (holding that Judicial Standards Commission, whose findings can lead to censure or removal by state supreme court, must accord due process hearing to district court judge). *Cf. Sinclair v. Schroeder*, 225 Kan. 3, 586 P.2d 683, 688 (1978) (holding that nonlawyer district magistrate who failed legal examination which was statutory precondition

to retention did not have vested interest leading to a due process right to a hearing).

The absence of sitting elected judges from this proceeding would appear likely to impair their ability to protect their continued tenure. A judgment for plaintiffs would invite new litigation by any sitting judges whose terms were truncated by the judgment.[11] Both Rule 19 and Rule 21 give the court the authority to order additional parties joined. *See* FED.R.CIV.P. 19, 21,; 3A Moore's Federal Practice ¶ 21.05(1) (2d ed. 1987) (discussing court's authority to act sua sponte under Rule 21). Even though we are aware that time is short before the November election, we refrain from ordering immediate joinder of these seemingly necessary parties for two reasons. First, no party has addressed the issue in its briefs, and we would prefer to have the benefit of the parties' views. Second, joining up to 201 [12] judges and justices as parties presents logistical questions.

If these judges and justices sought to intervene, we would let them. As things stand, however, the choice seems to be between ordering individual joinder and certifying the existence of a defendant class. A defendant class—perhaps with the most senior of the justices and the chief judges of the Appellate and Circuit courts as named defendants—might make this litigation more manageable than having about 200 additional defendants. The Seventh Circuit recently held that defendant classes may not, under any circumstances, be certified under FED.R.CIV.P. 23(b)(2). *See Henson v. East Lincoln Township*, 814 F.2d 410 (7th Cir.), *cert. granted,* — U.S. —, 108 S.Ct. 283, 98 L.Ed.2d 244 (1987). Therefore, if a defendant class were certified in this matter, it would have to be an "opt-out" class under FED.R.CIV.P. 23(b)(3). These judicial officers may not, however,

---

**11.** The situation here is reminiscent of *Hermes v. Hein*, 479 F.Supp. 820 (N.D.Ill.1979). In *Hermes,* plaintiff police officers who had not been promoted charged that defendant city officials had rigged a supposedly competitive examination. The court held that police officers who had been promoted as a result of the examination, and who might be demoted if plaintiffs prevailed in their suit, were necessary parties to the action. *Id.* at 826.

**12.** Plaintiffs could be required to join up to three Illinois Supreme Court justices, 21 Appellate Court judges, and 177 Circuit Court judges. That there will be contested elections this November for a few seats on the Circuit Court indicates that some seats are or will be vacant and that the actual numbers will therefore be slightly lower.

be ideal class defendants. Sitting judges and Justices may not, for example, have identical interests on the merits of this case.[13]

In sum, we are inclined to order the plaintiffs to join as parties all sitting judges whose terms could be truncated, or whose right to run in a retention election could be affected by a judgment in this case. This would mean that all state judges elected from Cook County would have to be joined except any whose terms of office expire this year and who are not running for retention.

The parties now before the court are requested to attend a status conference on Friday, August 12, 1988 at 2:00 p.m. to discuss the scheduling of various phases of this case and the matter of whether and how sitting judges should be joined in the action. Inasmuch as our treatment of sitting judges may affect candidates for judicial office, we stay our order requiring joinder of candidates until the conclusion of the conference.

CONCLUSION

We deny the defendants' motion to dismiss Count I as to blacks, Count II as to both subclasses, and Count III as to both subclasses. We grant the motion to dismiss Count I as to Hispanics. We dismiss all claims challenging the selection system for Associate Circuit Court judges. We also dismiss all claims against Samuel Con-

ti. We deny the motion to dismiss the claim against the State Board of Elections.

Plaintiffs are ordered to join candidates who have been nominated by a party within 14 days, and to join any other candidates within two weeks of their names being officially certified for the ballot. Plaintiffs are given leave to amend their complaint accordingly. A status conference will be held Friday, August 12, 1988 at 2:00 p.m. The order requiring joinder of candidates is stayed until the conclusion of the conference.

---

**13.** If the plaintiffs prevail on the merits, not all members of this defendant class would necessarily retain a communality of interest; we will cross that bridge if and when we come to it. *Cf.* Fed.R.Civ.P. 23(d) (order certifying class "may be altered or amended as may be desireable from time to time"). It could be argued that if the court were to determine that judges and justices had been illegally elected, they would then have no more of an equitable interest in the fashioning of relief than would any other potential candidate for judicial office. As we stated earlier, *supra* p. 1570, we do not decide whether candidates for judicial office have a property interest or any other due process right which could be affected by these proceedings.

Including sitting judges in this case could become particularly important in the event the court finds some, but not all, judicial elections in Cook County to have been in violation of § 2 of the Voting Rights Act. Plaintiffs request that

the court order judges to be elected from single-member districts. If, for example, the court holds that suburbs-only and county-wide elections for the Circuit Court violate the act, but that city-only elections do not, it would be anomalous to have county-wide judges elected from single member districts throughout the county but to continue to have city-only judges elected at large. Should we reach such a pass, the three groups of Circuit Court judges may each have unique interests. Thus, each sub-group of Circuit Court judges may be "so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest." Fed.R.Civ.P. 19(a)(2). Further, "[t]he addition of further parties ... alters the range of alternatives, some of which may be shown as feasible and more promising in their effectiveness." *Bradley v. School Bd. of Richmond, Va.,* 51 F.R.D. 139, 141 (E.D.Va.1970).