Hilbert L. BRADLEY, Thomas Z. Lewis, Barbara J. Cox, John Henry Hall, Imogene Harris, James T. Harris, Katie Hall, Henry E. Bennett, Edward D. Hegwood, and Karen Pulliam Willis, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

INDIANA STATE ELECTION BOARD, Alan K. Mills, Donald B. Cox, and Robert H. Wright, all in their official capacities as members of the Indiana State Election Board, Defendants.

Randall T. Shepard, Harold Abrahamson, Angelo Buoscio, Donald P. Levinson, Ruby S. Catlow, and Dean V. White, all in their official capacities as members of the Judicial Nominating Commission for the Superior Court of Lake County, Intervening Defendants.

Morton B. Kanz, James Danikolas, Gerald Svetanoff, James J. Richards, Jeffrey Dywan, Nicholas J. Schiralli, Paul D. Stanko, Bernard A. Carter, Richard W. Maroc, James E. Letsinger, Richard J. Conroy, James L. Clement, and Darlene Wanda Mears, all in their official capacities as Judges of the Superior Court of Lake County, Indiana, Intervening Defendants.

No. IP 91–898–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 22, 1992.

Stephen Laudig, Laudig & George, Indianapolis, Ind., Hilbert L. Bradley, Gary, Ind., William R. Groth, Fillenwarth Dennerline Groth & Baird, Indianapolis, Ind., for plaintiffs.

Alan K. Mills, Barnes & Thornburg, Indianapolis, Ind., for defendants Indiana State Election Bd., Alan K. Mills, Donald B. Cox, and Robert H. Wright.

Robert S. Spear, Chief Counsel, Office of the Atty. Gen., Indianapolis, Ind., for intervening defendants.

### ORDER ON MOTION TO DISMISS

McKINNEY, District Judge.

This matter is before the Court on a motion to dismiss filed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, by the two intervening defendants in this case: the Judicial Nominating Commission for the Superior Court of Lake County (the "Commission intervenors") and the group of judges currently sitting on that court (the "judicial intervenors"). These intervenors (collectively, the "defendants") have raised difficult issues under the Voting Rights Act of 1965, including one that apparently is of first impression. Their motion has been fully briefed and is ready for resolution.

### I.  FACTUAL AND PROCEDURAL BACKGROUND [1]

Lake County is located in the far northwest corner of Indiana, next to Lake Michigan near the Illinois border. According to the 1990 census, Lake County is home to 475,594 persons, of whom 116,688, or 24.54%, are black. The total voting-age population of the county is 342,427; of these persons, 76,995, or 22.5%, are black.

The Superior Court of Lake County (the "Superior Court") was created by the Indiana General Assembly in 1973. As currently structured, the Superior Court has thirteen judges serving in four divisions: civil (five judges), criminal (four), juvenile (one), and county (three). Judges in the county division are elected by popular vote on an at-large, county-wide basis for six-year terms. Judges in the other divisions are selected differently. When a vacancy occurs, the governor of Indiana selects a replacement from a list of three nominees submitted by a seven-member Judicial Nominating Commission, which was created specifically to fill vacancies on the Superior Court. This commission consists of the Chief Justice of the Indiana Supreme Court, or his designee; three attorneys elected by and from all the lawyers in Lake County; and three non-attorney citizens of Lake County, each of whom is appointed by the governor. *See* Ind.Code §§ 33–5–29.5–27 to –39. Once appointed, a judge serves for six years (unless he or she is completing the unexpired term of another judge). A judge who wishes to serve beyond the initial term of appointment must submit to an at-large, county-wide retention vote. If the judge fails to win retention, the nominating commission submits another list of nominees to the governor, who appoints a replacement in the same manner as before. *Id.* § 33–5–29.5–42. Currently, of the thirteen judges on the Superior Court, all but

---

1. In ruling on a motion to dismiss under Rule 12(b)(6), this Court must take the plaintiff's well-pleaded factual allegations as true. *Veal v.* *First Am. Sav. Bank,* 914 F.2d 909, 913 (7th Cir.1990); *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987).

one—a black judge elected to the county division in 1990—are white.

The plaintiffs, who are voting-age black citizens of Lake County, initiated the present action on August 9, 1991. Their amended complaint, filed September 24, 1991,[2] alleges that the present system for selecting and retaining judges in the civil, criminal, and juvenile divisions of the Superior Court violates the Voting Rights Act of 1965 by depriving black voters in Lake County of a fair opportunity to elect judges of their choice—presumably black judges. The amended complaint also alleges that the practice of holding at-large, county-wide elections (both for electing county division judges and for retaining judges in the other divisions) violates the Act by diluting the votes of black citizens, thereby making it impermissibly difficult to elect black judges.

The defendants filed their motion to dismiss on November 8, 1991. In this motion, they contend that the Act does not apply to judges in the civil, criminal, and juvenile divisions of the Superior Court, because these judges are appointed by the governor rather than elected by popular vote. In addition, the defendants claim that the plaintiffs have failed to plead the necessary threshold elements of a § 2 claim, because they have not alleged that Lake County's black voters live in a sufficiently compact geographic area, or that voting in the county is racially polarized. Briefing on the motion was completed February 3, 1992.

## II. DISCUSSION

### A. *Applicability of Voting Rights Act*

■ The Voting Rights Act of 1965 (codified at 42 U.S.C. §§ 1971–1974e) was enacted "to banish the blight of racial discrimination in voting" in the United States. *South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). Section 2 of the Act, codified as amended at 42 U.S.C. § 1973, focuses on doing away with artificial prerequisites that work to bar minorities from participating in the elective process. The section provides, in relevant part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Until last year, courts disagreed over the application of § 2 to elections of judges. This disagreement stemmed primarily from different interpretations of the word "representatives": some courts held that the term encompassed judges, *see, e.g., Mallory v. Eyrich,* 839 F.2d 275 (6th Cir.1988), while others held that it did not. *See, e.g., League of United Latin American Citizens Council No. 1344 v. Clements,* 914 F.2d 620 (5th Cir.1990). The Supreme Court resolved these differences with its decision in *Chisom v. Roemer,* —— U.S. ——, 111 S.Ct. 2354, 2365–66, 115 L.Ed.2d 348 (1991), which held that popularly elected judges are "representatives" as contemplated by § 2.[3]

The parties admit that under *Chisom,* § 2 of the Act governs the election of judges in the Superior Court's county division. Judges in the civil, criminal, and

---

**2.** The plaintiffs have requested certification of this suit as a class action, but resolution of that question is not critical to the present motion.

**3.** The Fifth Circuit's decision in *League of United Latin American Citizens* was reversed in *Houston Lawyers' Association v. Attorney General of Texas,* —— U.S. ——, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), which was decided the same day as *Chisom.*

juvenile divisions, however, unlike the judges in *Chisom*, are not popularly elected; although they submit to regular retention elections, giving voters a chance to keep or to reject them, these judges initially reach office by gubernatorial appointment. As a result of this difference, the defendants argue, Lake County's "hybrid" selection process does not fall within the Act, and they cite two portions of *Chisom* in support. First, *Chisom* defines "representatives" as being "the winners of representative, popular elections." *Id.* 111 S.Ct. at 2366. The defendants maintain that because the judges here never take part in such elections—i.e., they do not declare candidacy, run against opponents, or campaign actively—they cannot be representatives under the Act. Second, dicta in *Chisom* says that a state can "exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed." *Id.* at 2367. The defendants claim that this language removes Lake County's civil, criminal, and juvenile judges from the Act's coverage, because these judges are "appointed," regardless of whether they later submit to retention votes.

No case appears to have dealt with this precise issue, but several factors point to a conclusion that the Act does govern the retention elections in this case. Critically, the language of the Act on its face seems to reach all elections in which votes are cast, whether or not they involve declarations of candidacy, campaigning, or multiple candidates.[4] Section 14 of the Act defines the term "voting" to include "all action necessary to make a vote effective in any primary, special, or general election," including the casting of ballots "with respect to candidates for public or party office and *propositions for which votes are*

*received in an election.*" 42 U.S.C. § 1973 *l* (c)(1) (emphasis added); *see Chisom,* 111 S.Ct. at 2362 (applying § 14 definition in a § 2 case). In addition, there is language in *Chisom* which reflects an understanding that the Act reaches all elections:

> Section 2 protect[s] the right to vote, and it [does] so without making any distinctions or imposing any limitations as to which elections ... fall within its purview. As Attorney General Katzenbach made clear during his testimony before the House [in 1965], "[e]very election in which registered electors are permitted to vote would be covered" under § 2.

*Chisom,* 111 S.Ct. at 2362 (quoting *Hearings on H.R. 6400 and Other Proposals To Enforce the 15th Amendment to the Constitution of the United States before Subcommittee No. 5 of the House Committee on the Judiciary,* 89th Cong., 1st Sess. 21 (1965)).

Nothing in *Chisom* contradicts this understanding. The Court did say that appointed judges fall outside the Act, but it said this in a discussion which mentioned only judges who had been appointed for *life.* The Court contrasted appointed federal judges, who are "sheltered from public opinion by receiving life tenure and salary protection," with elected judges, who are "compel[led] ... to vie for popular support just as other candidates." *Id.* at 2367. It said nothing about "hybrid" judges like those in Lake County, who, because they are both appointed and elected, belong to neither category exclusively. Similarly, the Court's discussion of "representative, popular elections" seemed to assume a situation not present here—i.e., multi-candidate elections. *See id.* at 2366. This fact makes the Court's definition of "representatives" somewhat fact-specific, and hinders its application in the immediate context.[5]

---

**4.** Indeed, the Act apparently embraces elections in which there are no candidates at all. *See Lucas v. Townsend,* 908 F.2d 851 (11th Cir.1990) (grouping of four school bond projects into single referendum constituted a "procedure" governed by § 2), *vacated and remanded for clarification of jurisdictional issue,* — U.S. —, 111 S.Ct. 2845, 115 L.Ed.2d 1013 (1991).

**5.** Two other cases relied on by the defendants are similarly distinguishable. The court in *Irby v. Virginia State Board of Elections,* 889 F.2d 1352, 1355–56 (4th Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990), found no § 2 violation with regard to an appointive system for school board members. The members in question were not subject to retention votes, however, and the court did not hold that such systems never could be reached

It is true that retention votes do not carry all the usual attributes of elections for other offices. It is also true that terms such as "voting" or "election" usually refer to a choice made between two or more alternatives, such as when a voter selects between a Democrat and a Republican in a two-person race. The Act, however, by employing expansive definitions and being interpreted in "the broadest possible scope," *Allen v. State Bd. of Elections*, 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969), reaches far beyond the common understanding of these terms to encompass any "proposition[ ] for which votes are received in an election." The decision to keep or reject a sitting judge easily constitutes such a "proposition," and is one on which "[m]inority communities have the right to vote ... just as they have the right to a fully effective vote to elect candidates of their choice." *Lucas v. Townsend*, 908 F.2d 851 (11th Cir.1990), *vacated and remanded for clarification of jurisdictional issue,* —— U.S. ——, 111 S.Ct. 2845, 115 L.Ed.2d 1013 (1991).

One item deserves clear explanation at this point. The Court's determination that § 2 applies in this case is not intended to open up the entire judicial selection process to attack under the Voting Rights Act. The Act does apply to the county's retention elections, but this does not mean that it also governs the nomination and appointment procedures which first put judges onto the Superior Court. Even read narrowly, *Chisom* seems to make clear that such processes, which do not involve "voting," fall outside the Act. *See Chisom*, 111 S.Ct. at 2366–67. As a result, any attack on nomination or appointment procedures cannot be "piggybacked" onto a § 2 claim involving retention elections; some independent basis for a direct challenge must exist.

### B. *Sufficiency of the Claim*

The preliminary question decided, the Court now must determine if the plaintiffs have alleged a violation of § 2 in a form sufficient to withstand dismissal under Rule 12(b)(6). The defendants make two basic arguments on this point. First, they assert that Lake County's judicial retention elections cannot violate § 2, because nobody—white, black, or otherwise—gets to choose "representatives of their choice." Voters simply say "yes" or "no" to the retention of appointed judges. If nobody gets any opportunity to select representatives of their choice, the argument goes, blacks cannot be said to have "less" opportunity than whites, as is required for a violation of § 2 to exist. *See* 42 U.S.C. § 1973(b).

■ This argument has some appeal, but is not strong enough to warrant dismissal. A motion to dismiss should not be granted unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The plaintiffs have not had an opportunity at this stage to develop any facts to support their claim, and they are entitled to such a chance. Moreover, cases under § 2 require a "searching practical evaluation" of the "past and present reality" surrounding voting practices, as considered in light of the totality of facts and circumstances. *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 940 (7th Cir.1988) (quoting 42 U.S.C. § 1973(b) and S.Rep. No. 417, 97th Cong., 2d Sess., pt. 1 at 30 & n. 120, *reprinted in* 1982 U.S.C.C.A.N. 177, 208 (quoting *White v. Regester*, 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973))), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). No "searching" evaluation is possible on the record as currently developed, nor is an adequate balance of the factors that necessarily play a part in any election-scheme appraisal. *See McNeil*, 851 F.2d at 940. [6]

under the Act. Likewise, although the court in *Williams v. State Board of Elections*, 696 F.Supp. 1563 (N.D.Ill.1988) held that the Act did not apply to the selection of certain appointed judges, those judges were subject to retention votes by other judges, rather than the electorate, as here.

6. The factors to be considered include:

■ The defendants also contend that the plaintiffs have not met the threshold requirements for pleading a § 2 claim, as set out in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). According to that decision, plaintiffs challenging the validity of at-large elections under § 2 must demonstrate three prerequisites before their claims will be evaluated at length: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a hypothetical single-member district carved out from the at-large district; (2) that the group is politically cohesive; and (3) that the majority voter bloc is sufficiently cohesive to allow it, as a rule, to defeat the minority's preferred candidates. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766; *McNeil,* 851 F.2d at 942.

■ According to the defendants, dismissal is warranted because the plaintiffs have failed to allege either that black voters in Lake County "live in a sufficiently, geographically compact area to comprise a majority in a single member district," Defendants' Reply Brief at 6, or that voting in the county is racially polarized. Judicial Intervenors' Supporting Brief at 21–22. This contention has two problems. First, the Court in *Gingles* did not say that the three prerequisites must be *alleged* in the complaint; rather, it said that a plaintiff must *demonstrate* or *show* each element. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at

2766. This implies that a plaintiff should have an opportunity to prove the *Gingles* prerequisites by setting out facts in support of the claim.[7]

■ Second, even if there were a requirement that geographical compactness or racially polarized voting be specifically pleaded, the amended complaint here would appear to satisfy it. Paragraph 12 states that "virtually all [of the black citizens] reside in contiguous precincts located in northern Lake County," and this is a sufficient allegation of geographical compactness for present purposes. At this stage, it is not necessary to determine exactly what "contiguous precincts" are involved, or to engage in detailed, hypothetical redistricting. As to racially polarized voting, the plaintiffs state that "[b]lack voters in Lake County, in political contests where there is a clear choice between a white candidate and a black candidate, prefer the black candidate over the white candidate." Amended Complaint ¶ 19. This allegation will require fleshing out if the plaintiffs are to avoid summary judgment, *see Williams v. State Bd. of Elections,* 696 F.Supp. 1574, 1581 (N.D.Ill.1988) (stating that for summary judgment purposes, "political cohesiveness means that minorities vote as a block, not that they vote for candidates who belong to their racial or ethnic group"), but it is sufficiently stated for now.[8]

1. The extent of any history of official discrimination touching the right of minorities to register, vote, or participate in the political process;
2. The extent to which voting in the elections is racially polarized;
3. The extent to which the ... political subdivision has used unusually large election districts, majority vote requirements, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. Whether members of the minority group have been denied access to the candidate slating process;
5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;
7. The extent to which minorities have been elected to public office in the jurisdiction;
8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of minorities; [and]
9. Whether the policy underlying the ... political subdivision's voting practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess., pt. 1 at 28–29, *reprinted in* 1982 U.S.S.C.A.N. at 206–27.

7. This implication is supported by the apparent dearth of dismissals in other § 2 cases for failure to allege the *Gingles* elements specifically.

8. The defendants also claim that a finding that the appointment/retention plan violates the Voting Rights Act would violate the United States Constitution, because "[c]hoosing the

## III. CONCLUSION

For the reasons discussed above, the defendants' motion to dismiss is DENIED.

SO ORDERED.

manner and method of selecting state or local ... representatives is a power reserved to the states under the Tenth Amendment." Judicial Intervenors' Supporting Brief at 13. Even if the defendants were able to attack the Act on a Tenth Amendment ground—an uncertain prospect, it appears, *see Katzenbach,* 383 U.S. at 323–24, 86 S.Ct. at 816; *see also United States v.*

*Louisiana,* 265 F.Supp. 703 (E.D.La.1966), *aff'd,* 386 U.S. 270, 87 S.Ct. 1023, 18 L.Ed.2d 39 (1967)—such a claim at this phase would be premature. No need currently exists to determine whether Lake County's judicial selection system actually violates the Act; only the sufficiency of the plaintiffs' complaint under Rule 12(b)(6) is at issue.