994 F.Supp. 1105 (1997)
AFRICAN-AMERICAN VOTING RIGHTS LEGAL DEFENSE FUND, INC., Elbert A. Walton, Charles Q. Troupe, O.L. Shelton, Vernon Thompson, Errol S. Bush, Theodore Hoskins, Phillip B. Curls, Robert Bradley, Luretta B. Hawkins, St. Louis Council of Black Elected Officials, Inc., and Black Elected County Officials, Inc., Plaintiffs,[1]
v.
STATE OF MISSOURI; Mel Carnahan; Rebecca Cook; Leo G. Stoff, George Mehan, Judith Coleman, Fred Kratkey, Board of Election Commissioners, City of St. Louis, Missouri; Vivian Schmidt, John Moten, Francis Barnes III, Patrick J. Hickey, Board of Election Commissioners, County of St. Louis, Missouri; James R. Willard, Cynthia L. Ewert, Junious Buchanan, Ann M. Presley, Board *1106 of Election Commissioners, Jackson County, Missouri; Stanley A. Grimm; Gary A. Fenner; Thomas F. Simon; Edward D. Robertson, Jr.; Mavis Thompson; Gene Overall; and Jaci Morgan; Defendants.
No. 4:92CV00973 ELF.
United States District Court, E.D. Missouri, Eastern Division.
February 18, 1997.
*1107 *1108 *1109 Elbert A. Walton, Jr., St. Louis, MO, Larry D. Coleman, Kansas City, MO, for Plaintiffs.
*1110 Michael Boicourt, John R. Munich, Asst. Atty. Gens. of Missouri, Jefferson City, MO, Steven W. Garrett, Curtis and Oetting, St. Louis, MO, for Defendants.

MEMORANDUM
FILIPPINE, District Judge.
Trial in this case, by mutual agreement of the parties, was bifurcated into liability and remedy components. This matter is now before the Court following a nonjury trial on the liability component.[2] After consideration of the pleadings, the testimony and exhibits introduced at trial, the parties' briefs, and the applicable law, the Court enters the following memorandum, which it adopts as its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Introduction
Plaintiffs allege that African-Americans are under-represented on the bench in certain parts of Missouri. They fault Missouri's Non-partisan Court Plan (the "Plan") for this under-representation. Their complaint thus alleges that the Plan violates Sections 2 and 5 of the Voting Rights Act, 42 U.S.C. งง 1973 and 1973c[3], and the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.
Since the filing of the complaint, this Court has dismissed that portion of plaintiffs' complaint seeking relief under the Thirteenth Amendment to the United States Constitution. See Memorandum and Order, page 3, n. 2 (E.D.Mo., April 15, 1993).
Moreover, each of plaintiffs' "causes of action" referencing the Fourteenth Amendment to the United States Constitution is limited to an equal protection theory (under the equal protection clause of Section one of the Fourteenth Amendment) pursuant to the same document, see id. at page 3, n. 3, but it has been understood throughout this case that plaintiffs' Voting Rights Act theory includes some analysis of Section Two of the Fourteenth Amendment (regarding apportionment of representatives) as well.
Finally, plaintiffs' complaint has been limited to allegations regarding the supreme *1111 and appellate courts of Missouri, and the trial courts of the City of St. Louis, St. Louis County, and Jackson County. See id. at pages 11-12.

Stipulated Facts[4]
1. The voting age population of the State of Missouri as of 1990 was 3,802,247, of which 11,784 were lawyers;
2. The voting age African-American population of the State of Missouri as of 1990 was 369,239, or 9.7% of the 3,802,247 total, of which 282 were lawyers;
3. The voting age population of the State of Missouri as of 1940, when the Plan was first incorporated into the Missouri Constitution, was 3,784,664;
4. The voting age African-American population of the State of Missouri as of 1940 was 246,003 or 6.5% of the 3,784,664 total;
5. The voting age population of those residing in the Western Appellate District of the State of Missouri as of 1990 was 1,306,392;
6. The voting age population of those African-Americans residing in the Western Appellate District of the State of Missouri as of 1990 was 116,997, or 9.0% of the 1,306,392 total;
7. The voting age population of those residing in the Eastern Appellate District of the State of Missouri as of 1990 was 1,651,446;
8. The voting age population of those African-Americans residing in the Eastern Appellate District of the State of Missouri as of 1990 was 232,423, or 14.1% of the 1,651,446 total;
9. The voting age population of the City of St. Louis, Missouri, as of 1990 was 296,845, of which 1038 were lawyers;
10. The voting age African-American population of the City of St. Louis, Missouri, as of 1990 was 126,753, or 42.7% of the 296,845 total, of which 87 were lawyers;
11. The voting age population of the City of St. Louis, Missouri, as of 1940 was 816,048;
12. The voting age African-American population of the City of St. Louis, Missouri, as of 1940 was 108,534, or 13.3% of the 816,048 total;
13. The voting age population of St. Louis County, Missouri, as of 1990 was 749,134, of which 4,612 were lawyers;
14. The voting age African-American population of St. Louis County, Missouri, as of 1990 was 94,391, or 12.6% of the 749,134 total, of which 100 were lawyers;
15. The voting age population of Jackson County, Missouri, as of 1990 was 472,417, of which 2,521 were lawyers;
16. The voting age African-American population of Jackson County, Missouri, as of 1990 was 91,177, or 19.3% of the 472,417 total, of which 78 were lawyers;
17. The voting age population of Jackson County, Missouri, as of 1940 was 477,828;
18. The voting age African-American population of Jackson County, Missouri, as of 1940 was 42,527, or 8.9% of the 477,828 total;
19. As of April 24, 1995,[5] there had never been an African-American appointed to the Missouri Supreme Court, and only three African-Americans appointed to the Missouri Court of Appeals;
20. As of April 24, 1995, African-Americans represented:
(a) 6 of the 24 circuit judges, and 3 of the 7 associate circuit judges, in the City of St. Louis;
(b) 0 of the 20 circuit judges, and 3 of the 13 associate circuit judges, in St. Louis County; and
(c) 2 of the 19 circuit judges, and 1 of the 8 associate circuit judges, in Jackson County;

*1112 21. As of April 24, 1995, no African-American had ever served on a Missouri Appellate Judicial Selection Commission;
22. As of April 24, 1995, only three African-Americans had served on a 22nd Circuit Judicial Selection Commission, each of whom served a term consecutive to one another;
23. Pursuant to the Official Manual of the State of Missouri (1993-1994), the admission of which was stipulated to by the parties:
[I]n 1940 Missouri voters amended the Constitution by adopting the "Non-partisan Selection of Judges Court Plan," which was placed on the ballot by initiative petitions and which provides for the nonpartisan (nonpolitical) appointment of certain judges, rather than having them popularly elected.
The Constitution, as amended further in 1976, provides that the Plan is to be in effect for the Supreme Court, the Court[s] of Appeals[,] and for the circuit courts within the City of St. Louis and Jackson County. In addition, voters in St. Louis, Clay, and Platte counties have elected to institute the plan, and the Kansas City charter extends the non-partisan selection plan to Kansas City municipal judges. While all other judges are popularly elected, other judicial circuits may adopt the plan upon approval by a majority of the voters in the circuit.
Under the Missouri Court Plan, as it is often called, a vacancy on a court to which the plan applies is filled by appointment of the governor, who selects one person from a three-person panel chosen by a nonpartisan judicial commission of lay persons, lawyers, and judges. A judge appointed in this way must stand for retention in office at the general election occurring after the judge has been in office for twelve months; the judge's name is placed on a separate judicial ballot, without political party designation, and the voters must vote either for or against retention in office. The Missouri Court Plan has served as a national model for the selection of judges and has been adopted by a number of other states.
* * * * * *
Every supreme, appellate, circuit and associate circuit court judge must be licensed to practice law in Missouri. Official Manual (1993-1994) at pages 194-95.[6]
Additional Findings of Fact
1. Of the 87 African-American lawyers in the City of St. Louis eligible to be judges in 1990, 9 (10.34%) sat on one of the 31 seats available on the circuit or associate circuit bench as of April 24, 1995;
2. Of the 951 non-African-American lawyers in the City of St. Louis eligible to be judges in 1990, 22 (2.30%) sat on one of the 31 seats available on the circuit or associate circuit bench as of April 24, 1995;
3. Of the 100 African-American lawyers in St. Louis County eligible to be judges in 1990, three (3.00%) sat on one of the 33 seats available on the circuit or associate circuit bench as of April 24, 1995;
4. Of the 4512 non-African-American lawyers in St. Louis County eligible to be judges in 1990, 30 (0.70%) sat on one of the 33 seats available on the circuit or associate circuit bench as of April 24, 1995;
5. Of the 78 African-American lawyers in Jackson County eligible to be judges in 1990, three (3.85%) sat on one of the 27 seats available on the circuit or associate circuit bench as of April 24, 1995;
6. Of the 2443 non-African-American lawyers in Jackson County eligible to be judges in 1990, 24 (1.00%) sat on one of the 27 seats available on the circuit or associate circuit bench as of April 24, 1995;
7. The voting age population of those residing in the Southern Appellate District of the State of Missouri as of 1990 was 844,809;
8. The voting age population of those African-Americans residing in the Southern Appellate District of the State of Missouri as of 1990 was 19,819, or 2.3% of the 844,809 total, none of whom were lawyers;

*1113 9. The Missouri Supreme Court consists of seven judges, the Missouri Court of Appeals for the Eastern District, fourteen, the Missouri Court of Appeals for the Western District, eleven, and the Missouri Court of Appeals for the Southern District, seven judges;[7]
10. Ms. Sharon Tyus, Alderwoman for the 20th Ward in the City of St. Louis and Chairperson for the Council of Black Elected Officials, and Mr. Theodore Hoskins, Councilman for the City of Berkeley and member of the Council of Black Elected Officials, each African-Americans, testified that they were able to participate as voters, without impediment, and with the same opportunity as non-African-American citizens, in judicial retention elections;
11. Mr. Hoskins testified that he was opposed to the commission form of selecting and recommending names to the governor because the commission consists of five persons[8], two of whom are selected by the governor (who, never in Missouri's history, has been African-American), one of whom must sit on the Supreme Court (which has never had a African-American judge)[9], and two of whom are selected by a Bar which is, and has โ always been, over 90% non-African-American;[10]
12. Ms. Tyus testified that, as an African-American lawyer, she was able to participate as a voter, without impediment, and with the same opportunity as non-African-American lawyers, in selecting the lawyer members on Judicial Nominating Commissions;
13. Mr. Ronald Mitchell, President of the Missouri Bar, Dr. Frances Zemans, Executive Vice-President and Director of the American Judicature Society, and Judge David Mason testified that:
(a) the Plan provides St. Louis City and County and Jackson County with the best-qualified judges because merit is part of the selection process โ it is often called a "merit system";
(b) the Plan provides for a diverse judiciary insofar as studies have shown that the Plan, or its corollaries, put more women and minorities on the bench than a partisan election system;[11]
(c) partisan elections are much more costly,[12] and create potential conflicts of interest, because those seeking judgeships must raise money;
(d) judges elected to the bench under a partisan system run the risk of being removed (or elected), based on not a single factor relevant to what it takes to be a good judge;
(e) the best candidates for judgeships may not ever apply for election in a partisan *1114 system because they fear the politics associated with having to get elected, and re-elected;
(f) the Plan promotes the separation of the three branches of the government by eliminating, or limiting, "bossism," i.e., the Plan promotes an independent judiciary;
(g) the Plan tends to eliminate candidates at the "liberal" or "conservative" extremes;
(h) the Plan maximizes the pool of potential judges by minimizing the impediments, i.e., any lawyer with the minimum qualifications may submit an application;
(i) the Plan permits not only a diversity of applicants, but it promotes a judiciary which includes lawyers who previously represented the "less popular" of the legal arenas, e.g., former public defenders or public aid attorneys;
(j) the Plan avoids the personal attacks on judges and their families which occur in partisan elections;
(k) although judges must always strive to remain objective, partisan elections present a variable for the judges to consider that they need not consider in a retention situation โ whether their decision will be politically unpopular, and therefore potentially result in their being removed from office;
(l) there is a greater turnover of judges where the retention system is not in place;[13]
(m) it is hard to avoid the appearance of impropriety[14] in a partisan election system when attorneys appearing before a judge have contributed money to that judge, even though they must declare that they have done so;
(n) whenever a judge's record is subjected to political "spin" during the heat of a partisan campaign, the public's respect for that judge, and for the bench in general, may be diminished;
(o) the Plan avoids "one-issue" campaigns whereby candidates may be elected or defeated based on how they are perceived on a single issue;
(p) in a partisan election process an attorney with no, or virtually no, trial experience, can defeat one or more attorneys with a great deal of trial experience, based purely on personality or a large bankroll; and
(q) elected judges may be swept in or out of office by national or regional political landslides which have nothing whatsoever to do with the judges' abilities.
14. Dr. Zemans testified that the trend, nationally, for decades, has been away from the partisan election of judges and towards a merit or nonpartisan system of acquiring judges, culminating in a recent flurry of activity by several states adopting merit selection;
15. Mr. Mitchell testified that the sole purpose of each judicial selection commission is to select, from all the applicants, the three best qualified candidates;
16. Mr. Mitchell testified that it makes sense that only licensed attorneys may vote for the attorney-members of each judicial selection commission because the lawyers who practice before the bench every day want "the most competent judges, the most objective and fair judges [who] will apply the law evenly and equally across the spectrum;"
17. the process leading up to the appointment of judges, prior to these judges standing for retention under the Plan, is not devoid of politics, i.e., those candidates trying to gain the attention of the judicial selection commission use contacts to promote themselves before the lawyer and lay members of the commission, and those trying *1115 to gain the attention of the governor after nomination do the same;[15]
18. should the governor fail to appoint one of the three nominees selected by any judicial selection commission within sixty days after nomination, the commission may do so by majority vote;
19. plaintiffs called not a single expert witness to recite the problems, if any, with the Plan; nor did plaintiff call a single expert witness to identify the benefits which may be occasioned by a different procedure; Ms. Tyus did testify, however, that she thought that an elective process was more likely to result in a judiciary with a percentage of African-Americans on the bench similar to the percentage of African-Americans in the voting district;
20. Mr. Mitchell and Dr. Zemans testified that permitting every voter in any judicial election district[16] to vote for each of the judges in the voting district (i.e., at-large voting), and not for the judges just in a particular portion of the district (i.e., sub-districting), makes sense because the judges serve the entire judicial district, not just the subdistrict, and judges should not be beholden to their subdistrict electorate;
21. Dr. Zemans testified that in those instances where subdistrict judicial elections take place across the country, the interests of the political leader in that subdistrict, rather than the interests of the county at large, become the focal point of the election;
22. Mr. Mitchell testified that there is a rational distinction between the methods for acquiring and maintaining judges in the more populous regions of Missouri as compared with the more rural parts of Missouri โ where the population is small enough to know the candidates, and there is little media intervention, partisan elections make some sense because the candidates can and do interact with the public on a one-to-one basis. Once the vote becomes, to a large extent, media-driven, the merit/retention process makes much more sense;[17]
23. Ms. Kimberly Marie Beeman, paralegal for the Missouri Attorney General's Office, testified that she requested of Miss Susan LeBirda, of the St. Louis Post-Dispatch, a list of every newspaper article which appeared in the St. Louis Post-Dispatch between 1940 and 1945 regarding the Plan, that she read every such article, and that she found not a single reference to race;
24. Ms. Beeman also testified, on cross-examination, however, that she did not request of Ms. LeBirda that she provide a list of all those articles which mentioned the Plan and race. Nor did she read any entire issue of the Post-Dispatch from between 1940 and 1945. Nor did she ever read any articles from the St. Louis Globe-Democrat, the St. Louis Argus, the St. Louis American, the St. Louis Star Times, or any Kansas City newspaper, or any other newspaper, regarding the Plan;[18]

*1116 25. Judge Mason testified that having minorities on the judicial selection commissions was and is instrumental in getting minorities on the bench. In this vein, Judge Mason testified that, if there is a flaw in the Plan, the flaw is not in the retention election process, or in the merit selection process; it is in the process by which the nominating commissions are formed;[19]
26. Ms. Tyus, Mr. Mitchell, Ms. Beeman, and Judge Mason all testified as lay witnesses, while Drs. Weber[20] and Zemans[21] testified as certified experts in this case;
27. No testimony was offered that racial animus was a motivating factor behind the adoption of the Plan or behind the maintenance of the Plan; Dr. Zemans testified to the contrary, both as to Missouri, and on a nationwide basis;
28. Of the 11,784 licensed lawyers in Missouri as of 1990, 282, or 2.4%, were African-American;
29. Ryan Burson, state demographer for the State of Missouri, and liaison to the United States Bureau for the Census, testified that the only way to divide the State of Missouri into seven subdistricts (for the purpose of electing judges to the Missouri Supreme Court), with one subdistrict having a majority of African-American voters would be:
to include the concentrations of black voting-age persons in St. Louis City and County, follow along the Missouri River [] taking as little population as possible because there are few black voting-age populations along there in concentrations that don't also carry white voting-age populations, all the way along the Missouri River and reach into the Kansas City area.
Additionally, that wouldn't quite do it. One would have to reach down [] along the Mississippi River and pull in black voting-age populations in either the Bootheel or reaching down into Pulaski County.
(Trial Transcript, Vol. II, page 230);
30. Mr. Burson testified that this subdistrict would be neither compact nor contiguous;
31. Mr. Burson did not attempt to draw sub-districts, with or without African-American majorities, in the City of St. Louis, St. Louis County, or Jackson County;
32. In the 1940s the University of Missouri would not accept African-Americans to their law school, but the State of Missouri would pay the tuition of those African-Americans who attended law school out of state, such as Judge Lewis W. Clymer, who graduated from the Howard University School of Law; African-Americans also attended Lincoln University School of Law in Jefferson City, Missouri;[22]
33. Judge Clymer, an African-American, was a municipal judge in Kansas City from 1960-1970, and a circuit judge from 1970-1980;

*1117 34. Judge Clymer testified that, although he initially thought that at least part of the purpose of the Plan as it was drafted in 1940 was to deny or abridge the rights of African-Americans to vote, he was glad that he was wrong, and he now believes that the Plan "works pretty well;"
35. Judge Clymer further testified that he never heard any supporters of the Plan state that their purpose in drafting the Plan was to discriminate against African-Americans, and he did not know if anyone had such a motive in their minds;
36. It was nevertheless Judge Clymer's opinion that, in the absence of the Plan, more African-Americans would have sat, historically, and would now sit, on the bench through the political process;
37. Judicial selection commissions for appellate positions consist of one judge from the Missouri Supreme Court, three attorneys elected by their peers, one from each appellate district, and three lay members of the public appointed by the governor; and
38. Judicial selection commissions for circuit and associate circuit trial positions consist of the chief judge of the relevant appellate district within which the majority of the populace of the judicial circuit reside, two attorneys elected by their peers from the circuit, and two lay members of the public appointed by the governor.

Testimony of Dr. Ronald E. Weber
Dr. Weber, an expert on the Voting Rights Act and redistricting, having been consulted in forty to fifty such cases, was certified by this Court to testify regarding:
1. the behavior of voters, including a breakdown of their behavior based upon race, in judicial retention elections conducted within the State of Missouri between 1986 and 1994;
2. the factors associated with minority representation on the bench;
3. a statistical assessment of the relevant factors considered in assessing judicial selection systems; and
4. whether the manner in which voters vote in contested nonjudicial elections are predictions of, or consistent with, the manner in which voters vote in judicial elections.
(Trial Transcript, Vol. II, pages 17 and 33-34.) Dr. Weber was not certified to testify, and did not so testify, regarding cohesiveness and racial polarization in the election of attorneys to the judicial selection commissions.[23]
Following the statistical techniques recognized by the United States Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 52-53, 106 S.Ct. 2752, 2767, 92 L.Ed.2d 25 (1986), Bivariate Ecological Regression Analysis[24] and Extreme Case Analysis,[25] and using the basic statistical tool of standard deviations,[26] Dr. Weber analyzed the voting data *1118 from the 128 judicial retention elections conducted between 1986 and 1994 for the positions and jurisdictions in question.
Dr. Weber further reviewed his data to formulate answers to the following questions:
(1) Are African-American voters cohesive[27] (that is, do they, as a group, give a significant level of support to a particular candidate or choice) in judicial retention elections?
(2) Are non-African-American voters cohesive in judicial retention elections?
(3) Are African-American and non-African-American voters racially polarized[28] in judicial retention elections?
(4) Have non-African-Americans voted as a block to defeat African-American preferred candidates?
The answers to the above overlapping questions may be readily summarized. First, Dr. Weber testified that nationally, "overwhelmingly," while race is not a factor in the selection of judges in those states having a system based upon the Missouri Plan, race continues to be at issue in those states where judges are elected in partisan elections.
Dr. Weber also opined that the most appropriate elections to analyze for purposes of this case are retention elections in the jurisdictions in Missouri in question. It would be inappropriate to attempt to compare judicial retention elections with partisan general elections.[29] Not the least of the reasons which makes the comparison inappropriate is the race/political party nexus present in partisan elections.
Dr. Weber also testified that African-American voters, although tending to be moderately to strongly cohesive in each of the retention elections, never once voted cohesively in an attempt to defeat the retention of a judge. Non-African-American voters tended to be somewhat less cohesive, measuring less than 60% cohesiveness in 41 elections, and they, too, never once voted cohesively in an attempt to defeat the retention of a judge. Moreover, in not a single retention election did racially polarized voting take place. Thus, it cannot be concluded from the data that African-Americans as a group have attempted to oust non-African-Americans, or that non-African-Americans as a group have attempted to oust African-Americans, from the bench.
In conducting the standard deviation analysis, one first identifies the number of positions (i.e., the total number of seats on the bench) available and multiplies this number by the ideal representation rate of the class in question. Defendants argue that the *1119 ideal rate should be dictated by the number of attorneys available to fill slots on the bench, while the plaintiffs argue that the ideal rate should be dictated by the percentage of African-Americans in the total voting age population.[30]
The product of these two multipliers is the expected yield. One then multiplies this number by (1 minus the ideal rate), and takes the square root of the product thereof to determine the value of one standard deviation. Having thus determined the value of one standard deviation, one subtracts the expected yield from the total number of class representatives actually serving the position in question, and divides this total by the value of one standard deviation to achieve the number of standard deviations by which the class deviates from the ideal zero.
Applying this calculation to the ratio of African-American to non-African-American attorneys who find their way to the bench, one finds the following:[31]

Supreme Court -0.41 std. deviations
Mo.Ct.App.E.D. +0.93 std. deviations
Mo.Ct.App.W.D. -0.50 std. deviations
Mo.Ct.App.S.D. n/a[32]
St. Louis City +4.15 std. deviations
St. Louis County +2.73 std. deviations
Jackson County +2.41 std. deviations

It thus appears, in Dr. Weber's words, that African-Americans are statistically[33] over-represented on the bench in the City of St. Louis, St. Louis County, and Jackson County, and the degree of under- or over-representation of African-Americans on the bench in the remaining jurisdictions is not statistically significant.
Applying the same calculation to the ratio of African-Americans to non-African-Americans in the voting age population one finds the following:

Supreme Court -0.87 std. deviations
Mo.Ct.App.E.D. -0.75 std. deviations
Mo.Ct.App.W.D. -1.04 std. deviations
Mo.Ct.App.S.D. -0.41 std. deviations
St. Louis City -1.54 std. deviations
St. Louis County -0.61 std. deviations
Jackson County -1.08 std. deviations

It thus appears that African-Americans are under-represented on the bench in each of these jurisdictions, if one uses population rather than attorney ratios, but in none of these jurisdictions was the under-representation statistically significant.

The Debates of the Constitutional Convention of 1945[34]
The Plan was adopted by the people of Missouri, by constitutional initiative, in 1940, and retained by a second vote of the people in 1942. As such, it could not be amended absent a constitutional convention (or another initiative). In 1944 such a convention was convened, and the merits of the Plan were discussed on June 5 and 6, 1944.[35]
One opponent of the Plan, Mr. Phillips, argued that the Plan took away from citizens of the City of St. Louis and Jackson County the right to vote for judicial officers. As a result, Mr. Phillips argued, because the populations of these two areas constituted between one-quarter and one-third of Missouri's population, Missouri's representation in Congress would have to be reduced by the same ratio pursuant to Section 2 of the Fourteenth Amendment to the United States Constitution.[36] Mr. Phillips was incorrect, and plaintiffs' reliance on Mr. Phillips' argument is misplaced. See Holley v. Askew, 583 F.2d 728, 730 (5th Cir.1978).
Moreover, although Mr. Phillips spoke in terms of the Plan "discriminating" against the citizens of the City of St. Louis and Jackson County, it plainly does not discriminate in the sense that plaintiffs argue herein. African-American and non-African-American, rich and poor, all the citizens of the City of St. Louis and Jackson County are equally "discriminated" against, using Mr. Phillips' language.
Mr. Phillips did make a reference to the African-American populations of the City of St. Louis and Jackson County in responding to criticism by one of his peers at the Convention. Mr. Phillips stated that St. Louis and Kansas City had large African-American populations. Mr. Phillips did not indicate that the Plan abridged the right of African-Americans to vote any more than it abridged the right of anyone else to vote, however.
Finally, plaintiffs contend that Mr. Phillips' many references to "prejudices" in his oratory somehow benefits them in this case. There is no reason to believe that Mr. Phillips was referring to racial prejudice. Rather, it appears that Mr. Phillips used the word "prejudice" to mean "pre-judgment." This conclusion may be reached by turning to the very pages in the Convention transcript referenced by plaintiffs, and which read in part as follows:
[Mr. Phillips:] I couldn't even escape all the signs of prejudices that existed in the minds of some of the members regarding this question. Why, some of them said, "I could vote on it now." They were not on the Committee. They had never heard argument one way or the other. [Yet] they could vote on it right now....
We are now considering a problem that should be free of prejudices. We should not hesitate to express our views. We should not hesitate to contribute sound information upon it, and we should have the courage to state our views whether it be popular or not. You know there is something about the comfort of conforming ourselves to the pattern of the crowd or apparently the prevailing opinion ... or adapting ourselves to the popular side of the question [but] no progress was ever made by that viewpoint....

Plaintiffs' "Causes of Action"[37]
*1121 I. Defendants' denial of plaintiffs' right to vote for (a) the lawyers serving on the judicial selection commissions, and (b) the nominees themselves for judicial appointment, violates Section 2 of the Voting Rights Act, 42 U.S.C. ง 1973, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution.
II. Retention elections, however described, as contemplated under the Plan, result in the denial to plaintiffs, and to others in their class, the right to vote on the basis of race or color, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. ง 1973, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution.
III. The boundary lines for judicial circuits and appellate districts have been drawn in a way that fragments concentrations of African-American population, thereby diluting African-American voting strength, and resulting in a denial or abridgment of the rights of plaintiffs and members in their class to vote on account of race or color, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. ง 1973, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution.
IV. The requirement that judges be selected under the Plan impairs the ability of plaintiffs and members of their class to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. ง 1973, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution.

Declaratory Relief Requested, and Not Yet Denied
Plaintiffs request that this Court:
(1) declare unenforceable the Plan and "all constitutional provisions and statutes relating to" the selection and retention of "judicial selection commissioners and judges of the State and Municipalities of Missouri" until the abridgement of plaintiffs' right to vote is remedied under Section 2 of the Voting Rights Act;
(2) declare that the present method and use of the Plan violates the First, Fourteenth, and Fifteenth Amendments to the federal constitution and 42 U.S.C. ง 1973; and
(3) declare that the imposition and use of the Plan in the Sixteenth and Twenty-Second Judicial Circuits, by a vote of the voters of the state at large, and without a specific local option provision in the Missouri Constitution pertaining to such circuits, and thus without a specific vote of the voters of such circuits alone, is in violation of the First, Fourteenth and Fifteenth Amendments of the Constitution of the United States and 42 U.S.C. ง 1973.

The Law

I. Section 2 of the Voting Rights Act, 42 U.S.C. ง 1973
This section provides:
(a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section. (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
This Court recognizes, in reviewing plaintiffs' allegations brought under the Voting *1122 Rights Act, that "any alleged infringement of the right of citizens to vote must be carefully scrutinized." Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). Moreover, the Act "should be interpreted in a manner that provides `the broadest possible scope' in combatting racial discrimination." Chisom v. Roemer, 501 U.S. 380, 403-04, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991), quoting Allen v. State Board of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969).

I. A. The Voting Rights Act and Appointment
Mr. Walton identified one of the problems in this case when he asked Dr. Weber on cross-examination, "[d]o you view the challenge in this case to be how black people become judges or how they stay judges?" (Trial Transcript, Vol. II, at page 102.) Mr. Walton, at least at that juncture in the trial, clearly believed it was the former.
Lawyers become judges in the jurisdictions in question by appointment. Section 2 of the Voting Rights Act does not extend to the appointment of judges. Chisom, 501 U.S. at 401, 111 S.Ct. at 2367; Nipper, 39 F.3d at 1529-30. See also African-American Citizens v. St. Louis Police Comm'rs, 24 F.3d 1052, 1053 (8th Cir.1994); Williams v. State Bd. of Elections, 696 F.Supp. 1563, 1568-69 (N.D.Ill.1988) (Section 2 does not extend to the appointment of Associate Circuit Court Judges in Cook County). Plaintiffs' challenge to the actual appointment of judges by the governor in Missouri will therefore be dismissed.
Plaintiffs also challenge the process which: (a) places lawyers on a judicial selection commission which makes a three-nominee recommendation to the governor; and (b) deprives them of the ability to vote on these nominees. Because the election of two or three attorneys to a commission, and the process which results in sending three names to the governor thereafter, are but a prelude to the governor's appointment[38] this Court finds that the Voting Rights Act does not apply to either of these aspects of the appointment process as well. See Bradley v. Work, 916 F.Supp. 1446, 1454-55 (S.D.Ind. 1996) (because the lawyer members of the commissions are not "representatives" of the people, both the process putting them on the commissions, and the process resulting in their forwarding names to the governor, do not come under the umbras of the Voting Rights Act).

I. B. The Voting Rights Act and Retention Elections
Although the Voting Rights Act does not apply to appointments, it certainly applies in those instances where the electorate has the opportunity to elect their judges. Chisom, 501 U.S. at 404, 111 S.Ct. at 2368; White v. Alabama, 74 F.3d 1058, 1068 (11th Cir.1996). Retention elections are opportunities for the electorate to choose to retain a person as a judge. While a retention election does not place one person in electoral conflict with another, as in partisan elections, it is nonetheless an election. One serves at the will of the people in either event. This Court accordingly finds that retention elections are covered under the Voting Rights Act. See Nipper, 39 F.3d at 1529-30; Bradley v. Indiana State Election Board, 797 F.Supp. 694, 698 (S.D.Ind.1992).

I. B. (1) The Gingles Factors
In order for plaintiffs to prevail on their retention election claim under the Voting Rights Act, they must demonstrate that African-Americans constitute a sufficiently large and geographically compact population somewhere in a multi-member voting district so as to constitute a majority in a single member district therein, were the district subdistricted.[39]Thornburg v. Gingles, 478 *1123 U.S. 30, 50-51, 106 S.Ct. 2752, 2766-67 (1986).[40] Plaintiffs then must demonstrate that the African-Americans in this subdistrict vote cohesively. Third, the plaintiffs must demonstrate that the non-African-American majority in this district votes sufficiently as a block to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. Id.[41]
Plaintiffs cannot prevail on their Section 2 claims regarding the Missouri Court of Appeals for the Southern District of Missouri because the African-American population is so small in that voting district that, were the district subdistricted, African-Americans could not constitute a majority in any single member district created therein.
Plaintiffs also cannot prevail on their Section 2 claim regarding retention elections for the Supreme Court insofar as Ryan Burson, state demographer for the State of Missouri and liaison to the United States Bureau for the Census, testified that the only way to divide the State of Missouri into seven subdistricts, with one subdistrict having a majority of African-American voters, would be to stretch the subdistrict over much of the state to include the concentrations of African-American voting age persons in St. Louis City, St. Louis County, Jackson County, and either the Bootheel or Pulaski County. Mr. Burson further testified that this subdistrict would be neither geographically compact nor contiguous. Such a subdistrict would thus violate Shaw v. Reno, 509 U.S. 630, 656-59, 113 S.Ct. 2816, 2832, 125 L.Ed.2d 511 (1993) and Miller v. Johnson, 515 U.S. 900, 919-23, 115 S.Ct. 2475, 2490-91, 132 L.Ed.2d 762 (1995), insofar as the only feature linking these disparate territories would be the numerosity of African-Americans.[42]
As for retention elections in the Courts of Appeal for the Eastern and Western Districts of Missouri, and the trial courts in the City of St. Louis, St. Louis County, and Jackson County, although plaintiffs demonstrated the size of the African-American populations in each of these jurisdictions, plaintiffs failed to demonstrate that a voting subdistrict or subdistricts could be created in each with the requisite compactness. In other words, plaintiffs failed to "prove that there is a `solid and substantial' potential to elect a minority-preferred candidate in [any] single-member district" which could be carved from each of these jurisdictions. See Thompson, 935 F.Supp. at 1424 (internal citation omitted). This Court is nevertheless willing to assume same, arguendo, and will move on to the second and third Gingles elements.
African-American voters historically across the state have been moderately to strongly cohesive in retaining judges, but never once have they voted cohesively in an attempt to defeat the retention of a judge. Non-African-American voters tended to be somewhat less cohesive in voting to retain *1124 judges, measuring less than 60% cohesiveness in 41 retention elections, but they, too, never once voted cohesively in an attempt to defeat the retention of a judge. Moreover, in not a single retention election analyzed did racially polarized voting take place. Thus, it cannot be concluded from the data that African-Americans as a group have attempted to oust non-African-Americans, or that non-African-Americans as a group have attempted to oust African-Americans, from the bench. Plaintiffs therefore have not demonstrated all three of the Gingles preconditions with respect to retention elections because, although there is evidence that African-Americans vote cohesively in retention elections, there is no evidence that non-African-Americans have voted sufficiently as a bloc to enable them to defeat the African-Americans' preferred candidates. See also Nash v. Blunt, 797 F.Supp. 1488, 1503-1505 (W.D.Mo.1992) (non-African-Americans in Jackson County, St. Louis County, and the City of St. Louis found not to have voted as a block in various elections between 1979 and 1991 to defeat minority-preferred candidates), aff'd, 507 U.S. 1015, 113 S.Ct. 1809, 123 L.Ed.2d 441 (1993). Having failed to establish the three preconditions, "there neither has been a wrong nor can [there] be a remedy." Growe v. Emison, 507 U.S. 25, 40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993).
Nevertheless, insofar as the intent of Congress in drafting ง 2 of the Voting Rights Act was to prohibit "those voting systems which have the effect of allowing a community motivated by racial bias to exclude a minority group from participating in the political process," Nipper, 39 F.3d at 1514-15, (i.e., a results test), this Court will evaluate the totality of the circumstances to determine same in addition to its Gingles factors analysis. See Johnson v. DeGrandy, 512 U.S. 997, 1011-12, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994).

The Totality of the Circumstances
"Satisfaction of these three `preconditions' [the Gingles factors] is necessary, but not sufficient, to establish liability under Section 2. Plaintiffs must also show that under the `totality of the circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice [as] enjoyed by other voters." League of United Latin Amer. Citizens v. Clements, 999 F.2d 831, 849 (5th Cir.1993) (en banc) (citations omitted), cert. denied, 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). See also Milwaukee Branch of the NAACP v. Thompson, 935 F.Supp. 1419, 1423 (E.D.Wis.1996) (proof of the three preconditions creates an inference that the minority group is harmed by the present electoral structure, but that inference is rebuttable within the context of the totality of the circumstances analysis).
Courts have applied a variety of factors in determining the "totality of the circumstances," but Courts typically are guided by the list of factors set forth in Senate Report 417, reprinted in 1982 U.S.Code Cong. & Admin.News at 206-207. The Report indicates that "[t]ypical factors include:"
1. the extent of any history of official discrimination in the State or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the State or political subdivision is racially polarized;
3. the extent to which the State or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the State or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;

*1125 7. the extent to which members of the minority group have been elected to public office in the jurisdiction;
* * * * * *
[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
[9.] whether the policy underlying the State or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
This list of factors "is neither comprehensive or exclusive," however. Certain factors may "be pertinent to certain types of ง 2 violations [while] other factors may also be relevant and may be considered."[43]Gingles, 478 U.S. at 45, 106 S.Ct. at 2763.
Plaintiffs place particular emphasis on the first of the factors, arguing that, "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." Village of Arlington Heights v. Metropolitan Housing Devel. Corp., 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Plaintiffs then invite this Court to review their Exhibit 192, a litany of Missouri constitutional provisions, statutes, ordinances, and decisions dating from 1820 to 1976, as evidence of the fact that the State of Missouri, St. Louis and Jackson Counties, and the City of St. Louis, all have engaged in "official discrimination."
This Court is willing to accept that which plaintiffs are apparently attempting to demonstrate through exhibit 192. That exhibit sets out documents reflecting race discrimination. This Court is also willing to assume that plaintiffs have demonstrated, through this exhibit, that this discrimination has touched upon the ability and the right of African-Americans to register, to vote, and to otherwise participate in the democratic process. This Court is willing to assume further that, through exhibit 192, plaintiffs have provided this Court with evidence in support of the first of the factors outlined above.[44]
Plaintiffs have provided no evidence which would support their case with respect to factors 2, 3, 4, 6, 7, [8], and [9]. Indeed, as discussed below, the evidence favors defendants with respect to factors 2, 7, and [9]. The only remaining factor potentially favoring plaintiffs is the fifth, wherein the Court is required to determine the extent to which the effects of race discrimination in such areas as education, employment, and health hinder plaintiffs' ability to participate effectively in the political process. Plaintiffs provided very little evidence in this regard.
This Court recognizes that, "[t]he failure of plaintiff to establish any particular factor is not evidence of non-dilution." S.Rep. No. 417 at 29, n. 118, 1982 U.S.C.C.A.N. at 207, n. 118. It is not even mandatory that plaintiffs prove a majority of the factors. Id. Plaintiffs have "established" little, however. While plaintiffs have provided this Court with some evidence with respect to the second and fifth factors, this Court is extremely reluctant to conclude that plaintiffs have "established" either factor as an evidentiary matter. In any event, whatever the quantum of evidence plaintiffs have placed on the scale, it is far outweighed, as follows, by the evidence to the contrary.
The second factor weighs in defendants' favor because there is no evidence before this Court of racially polarized voting. The seventh factor also weighs in defendants' favor because African-Americans have been generally successful in reaching the bench in the jurisdictions in question; and, to whatever extent it is relevant, African-Americans have also been successful in reaching nonjudicial public office in Missouri of late. The telling factor in defendants favor is the ninth, however.
*1126 As a matter of law, states have a legitimate interest in their judges' jurisdictional territory being the same as their electoral territory. Houston Lawyers, 501 U.S. at 426-28, 111 S.Ct. at 2381. "The state's interest in linking jurisdictional and electoral bases has been recognized by a number of federal appellate courts as `substantial.' Southern Christian Leadership Conference of Alabama v. Sessions, 56 F.3d 1281, 1294 (11th Cir.1995), Cousin v. McWherter, 46 F.3d 568, 577 (6th Cir.1995); LULAC, 999 F.2d at 872." Thompson, 935 F.Supp. at 1430-31.
Similarly, as a matter of fact, defendants have established that Missouri has a legitimate interest in its judges' jurisdictional territory being the same as their electoral territory. See Additional Findings of Fact Nos. 20 and 21.
Although this interest is but one of the factors to be considered by the Court in evaluating the totality of the circumstances, and it should not "`automatically, and in every case, outweigh proof of racial vote dilution,' the Court held that the state interest could outweigh what would otherwise be proof of illegal dilution and thus foreclose liability." LULAC, 999 F.2d at 870, quoting Houston Lawyers, 111 S.Ct. at 2381 (emphasis in original). Stated another way, the state's interest in linkage may not "be overcome by marginal evidence of vote dilution." Thompson, 935 F.Supp. at 1431.
In a case such as this, where plaintiffs have offered (at best) marginal evidence of vote fragmentation or dilution, the state's legitimate interest in their judges' jurisdictional territory being the same as their electoral territory dictates the result. Subdistricting is not warranted and no other remedy has been implicated which leads this Court to conclude that the retention elections in question violate the Voting Rights Act. This portion of plaintiffs' complaint will therefore be dismissed. See also Southern Christian Leadership Conference v. Evans, 785 F.Supp. 1469, 1478 (M.D.Ala. 1992), aff'd, 56 F.3d 1281 (11th Cir. 1995), cert. denied, 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996).

I. C. The Voting Rights Act and the Failure to Provide the 16th and 22nd Judicial Circuits with the Partisan Option
Although not addressed in plaintiffs' "causes of action," plaintiffs seek a declaration that the imposition and use of the Plan in the Sixteenth and Twenty-Second Judicial Circuits, by a vote of the voters of the state at large, and without a specific local option provision, and thus without a specific vote of the voters of such circuits alone, is in violation of the First, Fourteenth, and Fifteenth Amendments of the Constitution of the United States and 42 U.S.C. ง 1973. The Court shall address the ง 1973 aspect of this request along with the constitutional claims, infra.

II. First Amendment Claims
Other than being typed on the face of plaintiffs' complaint, the First Amendment has not been referenced by plaintiffs in their briefs or testimony throughout this litigation. Plaintiffs sought no relief under the First Amendment, and have never attempted to explain how they believe that defendants have violated the First Amendment. Plaintiffs' First Amendment claims will therefore be dismissed.[45]

III. A. The Equal Protection Clause of the Fourteenth Amendment and the Ability to Place Attorneys on Commissions
Plaintiffs challenge the fact that they are denied the right to vote for lawyer members of the judicial selection commissions. In order to prevail on this claim under the equal protection clause of the Fourteenth Amendment, plaintiffs must demonstrate that this aspect of the Plan was "conceived or operated as [a] purposeful device to further racial [ ] discrimination." Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). In this regard, "it is not enough to show that *1127 the group allegedly discriminated against has not [been represented] in proportion to its numbers." City of Mobile v. Bolden, 446 U.S. 55, 67, 100 S.Ct. 1490, 1499-1500, 64 L.Ed.2d 47 (1980).[46] Rather, plaintiffs must demonstrate that defendants' purpose, in conceiving or operating that aspect of the Plan which permits lawyers to elect lawyers to the commissions, was "invidiously to minimize or cancel out the voting potential" of African-Americans. Id. See also Village of Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 265-66, 97 S.Ct. 555, 563-64, 50 L.Ed.2d 450 (1977). Plaintiffs must also demonstrate that such purposeful discrimination has had an actual discriminatory effect. Davis v. Bandemer, 478 U.S. 109, 127, 106 S.Ct. 2797, 2808, 92 L.Ed.2d 85 (1986); Turner v. Arkansas, 784 F.Supp. 553, 579 (E.D.Ark.1991), aff'd, 504 U.S. 952, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992).
Plaintiffs provided no evidence that defendants have purposefully kept African-Americans from holding seats on the nominating commissions. Plaintiffs did, however, provide evidence that there have been few African-Americans on these commissions. A dearth of African-American commissioners, absent further evidence of the intent to discriminate, does not carry the day for the plaintiffs, however.[47]
Only lawyers have the right to vote for lawyer members of the judicial selection commissions to the exclusion of all other Missouri citizens, whether African-American or non-African-American. African-Americans have not been targeted for discrimination in this regard. If a class has been singled out for discrimination, it would be the class consisting of the entire nonlawyer populace of the State of Missouri. This class does not constitute a "suspect-class" under Fourteenth Amendment parlance because, "the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." San Antonio Ind. School Dist. v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Because the entire nonlawyer populace of the State of Missouri does not constitute a "suspect-class,"[48] and African-Americans have not been singled out for discrimination, Missouri's practice of permitting lawyers to elect the lawyers on the nominating commissions has not operated to the peculiar disadvantage of any suspect class.
Moreover, Missouri's practice of permitting lawyers to elect the lawyers on the nominating commissions does not interfere with the exercise of a fundamental right because there is no fundamental right of every citizen to vote in every election which happens to take place in Missouri. See San Antonio, 411 U.S. at 35, n. 78, 93 S.Ct. at 1298, n. 78. It is only a "right to participate in elections on an equal basis with other citizens in the jurisdiction." St. Louis County v. Town and Country, 590 F.Supp. 731, 737 (E.D.Mo.1984). Thus, because plaintiffs have failed to demonstrate that African-Americans are precluded from their "right to participate in elections on an equal basis with other citizens in the jurisdiction" they have consequently failed to demonstrate that a fundamental right has been trammelled upon.
Plaintiffs contend that, because they represent a suspect class and/or because defendants have interfered with their fundamental right to vote, strict scrutiny of defendants' actions is required, and they must prevail unless defendants can demonstrate a compelling governmental interest in the status quo and that same is narrowly tailored to serve *1128 that interest. Plaintiffs cite Miller v. Johnson, 515 U.S. 900, 919-23, 115 S.Ct. 2475, 2490-1, 132 L.Ed.2d 762 (1995), Gregory v. Ashcroft, 501 U.S. 452, 469-71, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991), Reynolds v. Sims, 377 U.S. 533, 561-62, 84 S.Ct. 1362, 1381-82, 12 L.Ed.2d 506 (1964), Eu v. San Francisco Democratic Cent. Comm., 489 U.S. 214, 223, 225, 109 S.Ct. 1013, 1020-21, 103 L.Ed.2d 271 (1989), Moore v. Ogilvie, 394 U.S. 814, 818, 89 S.Ct. 1493, 1496, 23 L.Ed.2d 1 (1969), and Harper v. Virginia State Board of Elections, 383 U.S. 663, 667, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966) in support of this proposition (page citations are plaintiffs'). Were plaintiffs a suspect class, or if a fundamental right was being abridged, and if an election of general interest (such as election for a legislator) were at issue, plaintiffs' statement of the law could not be faulted. See Kramer v. Union Free School District No. 15, 395 U.S. 621, 627, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583 (1969). Plaintiffs in these circumstances are not a suspect class, no fundamental right has been abridged, and the election of lawyers to commissions is not an election of general interest.[49]
Accordingly, because the practice of lawyers electing lawyers does not operate to the peculiar detriment of any suspect class, and it does not trammel upon a fundamental right, the only issue remaining is whether there is a rational basis for the practice in question. Stiles v. Blunt, 912 F.2d 260, 2623 (8th Cir.1990), cert. denied, 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 241 (1991). Under the rational basis test, a challenged decision "will not be set aside if any set of facts reasonably may be conceived to justify it." Id. Cf. Gregory v. Ashcroft, 501 U.S. 452, 470-71, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991) (decision of Missouri to preclude those aged 70 and over from serving as judges subject to rational basis, and not strict scrutiny, review).[50]
The practice in question places three lawyers on seven-person judicial selection commissions, and two on five-person commissions. Each type of commission also has an equal number of lay persons as well as a judge. Certainly, it is reasonable, if not necessary, to have lawyers on these commissions. There is no one better to evaluate the ability of potential judges than the attorneys who will have to practice before them every day. Attorneys typically will know the judicial aspirants better than the general public. They will know which aspirants have the legal acumen, the intelligence, and the temperament to best serve the people of Missouri. It is therefore quite clear that attorneys must serve on the commissions.
The question thus presented is, given the fact that attorneys should sit on the judicial selection commissions, whether the present mechanism for placing them there is rational. Defendants contend that lawyers properly elect lawyers to the commissions for much the same reasons that attorneys are well-suited to nominate judges. Defendants assert that attorneys know their peers, and they know who will be best-suited to evaluate the ability of commission aspirants.
Plaintiffs counter that the process by which attorneys become commissioners has nothing to do with the ability of commissioner aspirants. They assert that the "silk stocking" firms predetermine who each commissioner will be and then steamroll the bar with their choice.
Assuming, arguendo, that plaintiffs are correct, they still do not prevail on this point because they have presented absolutely no evidence that it was anyone's intent, ever, to purposefully discriminate against African-Americans. That aspect of the Plan designed to have lawyers select lawyers to sit on the commissions was rationally conceived and maintained. The fact that African-American lawyers have been historically unable *1129 to gain a foothold on the commissions demonstrates little, other than the fact that, to date, there have been very few black lawyers. It does not demonstrate purposeful discrimination.[51]
Finally, there is no evidence that those attorneys who may vote, or have voted, have engaged in any discrimination or abridgement of plaintiffs' rights. Moreover, both plaintiffs' and defendants' evidence established that all those lawyers, regardless of their race, who wish to vote for the lawyer members on the commissions may do so without impediment. Plaintiffs' equal protection claims regarding the selection of attorneys will therefore be denied.

III. B. The Equal Protection Clause of the Fourteenth Amendment and the Ability to Vote for Nominees
For the reasons set forth at ง I.A., regarding the Voting Rights Act and plaintiffs' ability to vote for nominees, and for the reasons set forth at ง III. A., regarding the equal protection clause and the mechanism which places attorneys on the judicial selection commissions, this Court finds that plaintiffs are not entitled to relief on this claim. In short, plaintiffs had no constitutional right to vote for the nominees in question, and they have failed to demonstrate any purposeful discrimination in thought, word or deed relating to their inability to vote for the nominees.

III. C. The Equal Protection Clause of the Fourteenth Amendment and Retention Elections
In order to prevail on this claim under the equal protection clause of the Fourteenth Amendment, plaintiffs must demonstrate that the Plan was designed to purposefully keep African-Americans off the bench in 1940, when the Plan was adopted, and thereafter, as the Plan has been amended and maintained. Perkins v. West Helena, 675 F.2d 201, 207-209 (8th Cir.), aff'd, 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982). Plaintiffs offered no evidence in support of either proposition. Indeed, the person plaintiffs called, ostensibly to prove these points, Judge Clymer, testified to the contrary. Meanwhile, Dr. Zemans testified directly and specifically that she found no evidence of discriminatory intent in the drafting or maintenance of the Plan in this regard.
Plaintiffs also fail to demonstrate an actual discriminatory effect. As set forth in the statistical analysis, supra, plaintiffs have failed to demonstrate that the impact of the Plan has been to keep African-Americans off the bench. Again, the evidence is to the contrary.

III. D. The Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment and the Failure to Provide the 16th and 22nd Judicial Circuits With the Partisan Option
Plaintiffs contend that the voters of the 16th and 22nd judicial circuits are discriminated against because they are not permitted to opt out of the Plan while all of the remaining judicial circuits in the state may opt in or out of the Plan as they wish. They contend that the right to vote is fundamental, and it is arbitrary and capricious to distinguish the citizens of the 16th and 22nd judicial circuits from the citizens in all the other judicial circuits in the state.
Addressing the Voting Rights Act first, plaintiffs have offered a viable alternative to requiring the 16th and 22nd judicial circuits to be governed by the Plan; plaintiffs suggest that the voters in those districts should be permitted to opt in or out of the Plan just like the voters in the rest of the state. Plaintiffs have not demonstrated, for the reasons set forth in this memorandum, the necessity for change, however. Plaintiffs, despite having proposed a rational remedy as to this portion of their complaint, have failed to demonstrate that defendants have violated the Voting Rights Act.
*1130 Turning to plaintiffs' equal protection allegations, it is plain that the "fundamental right to vote" is only the "right to participate in elections on an equal basis with others in the jurisdiction." St. Louis County v. Town and Country, 590 F.Supp. at 737-38. In Town and Country, certain plaintiffs who resided outside of an annexing municipality, or who resided outside an area to be annexed, challenged the fact that they did not have the opportunity to vote on the annexation. By law, the only persons who could vote were those residing in the annexing municipality and those who resided in the area to be annexed. Thus, one municipality arguably could strip another of its best real estate without certain of the citizens in the second municipality being able to vote on the matter. The Court held that the plaintiffs had no constitutional/fundamental right to vote on the annexation because, under Missouri law, they did not reside in the same jurisdiction as the annexing municipality or the area being annexed.
Defendants properly contend that Town and Country applies here. The state has made a determination that its counties shall be organized geographically into judicial circuits. This Court's inquiry, thus, is not whether voters in the 16th judicial circuit presently have the same right to vote the Plan in or out as voters in another 17th judicial circuit. Rather, the inquiry is whether plaintiffs have the ability to participate in the elections which do take place in the 16th judicial circuit as others in that jurisdiction. As set forth, supra, it is plain that they do. Moreover, plaintiffs have offered no evidence that purposeful discrimination has ever taken place in association with, or as a result of, the amendment to the Missouri Constitution requiring the 16th and 22nd judicial circuits to use the Plan, or thereafter.

IV. A. The Fifteenth Amendment
Plaintiffs appear to argue under the Fifteenth Amendment that, because only Missouri lawyers may vote for the lawyer members of the judicial selection commissions, and African-Americans are significantly under-represented on the bar, the right of African-Americans to "elect representatives of their choice" has been abridged or denied. It is not clear which "representatives" plaintiffs are addressing at page 32 of their post-trial brief.
If plaintiffs are challenging the "election" or nomination process by which three names are presented to the governor by any judicial selection commission, plaintiffs' argument fails for the reasons set forth at งง I.A. and III.B., supra. If plaintiffs are challenging the retention elections thereafter, plaintiffs' argument fails for the reasons set forth at งง I.B. and III.C., supra. Finally, if plaintiffs are challenging the election of the attorney commissioners by the bar, plaintiffs' argument largely fails for the reasons set forth at งง I.A. and III.A., supra.
Specifically, in order to establish defendants' liability under the Fifteenth Amendment, plaintiffs must establish purposeful discrimination, as with their Fourteenth Amendment equal protection allegations. See Bradley, 916 F.Supp. at 1465, citing Chisom, 501 U.S. at 403, 111 S.Ct. at 2368 and Gingles, 478 U.S. at 35, 106 S.Ct. at 2758. Plaintiffs have failed to demonstrate purposeful discrimination with respect to any of these claims.
Plaintiffs' allegation that bar membership is "akin to" a poll tax or a literacy test hardly warrants further discussion.
Historically, poll taxes and literacy tests were utilized by the white majorities in certain jurisdictions to preclude the poor and the illiterate from participating in the democratic process. Poll taxes and literacy tests are abhorrent specifically because they preclude the poor and the illiterate from participating in the democratic process. The existence of law schools and bar exams does nothing to preclude the poor and the illiterate from participating in the democratic process. Plaintiffs' allegation that bar membership is "akin to" a poll tax or a literacy test is therefore false.
NOTES
[1] Although plaintiffs in their briefs, testimony, and in questioning witnesses, have used the term "African-American" and "black," this Court shall refer to this demographic group as African-American so as to be consistent with the style of this case.
[2] The parties and the Court recognized, however, that "the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases," Nipper v. Smith, 39 F.3d 1494, 1530-31 (11th Cir.1994), cert. denied, 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). "The absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability." Id. at 1533.

This Court accordingly entertained argument by plaintiffs that, under one available remedy, certain judicial voting districts should be redistricted into subdistricts with a majority of minority voters. This Court also entertained argument by plaintiffs that other remedies may be available. Defendants offered evidence to the contrary, and plaintiffs responded to same.
Thus, while this Court considered the availability and viability of plaintiffs' proposed remedies, as it was required under Section 2, the parties and the Court reserved any analysis of the specific implementation of those remedies for the proposed remedy portion of the trial.
[3] Although plaintiffs reference Section 5 of the Voting Rights Act, 42 U.S.C. ง 1973c, in their complaint, plaintiffs have never alleged what actions or omissions by defendants violated the section.

Section 1973c addresses changes in voting qualifications, prerequisites, standards, practices, or procedures imposed by a state or political subdivision after November 1, 1964. This section permits the state or political subdivision to obtain a preclearance from the United States Attorney General certifying that these changes have neither the purpose nor the effect of denying or abridging the right to vote on account of race or color, and that these changes do not contravene the guarantees set forth at 42 U.S.C. ง 1973b(f)(2). In the alternative, under this section the state or political subdivision may seek a judgment from the United States District Court for the District of Columbia declaring same.
Plaintiffs have never sought the relief contemplated under Section 5. Specifically, plaintiffs have never alleged that the State of Missouri or some political subdivision thereof failed to obtain preclearance from the Attorney General or the Court of some change in voting qualifications, prerequisites, standards, practices, or procedures imposed by the state or some political subdivision after November 1, 1964.
Finally, Section 5 is somewhat unusual in that it contemplates any actions brought thereunder to be heard by a three judge panel. Plaintiffs specifically indicated, however, that they wanted this case to be resolved by the undersigned.
Thus, although plaintiffs reference both Section 2 of the Voting Rights Act, 42 U.S.C. ง 1973, and Section 5 of the Voting Rights Act, 42 U.S.C. ง 1973c, this Court finds that no Section 5 claim is presently properly before it.
[4] In recounting the facts in this case, this Court has endeavored to discuss "not only the evidence that supports its decision, but also all substantial evidence contrary to its opinion." Harvell v. Ladd, 958 F.2d 226, 229 (8th Cir.1992), quoting Buckanaga v. Sisseton Ind. School Dist. No. 54-5, 804 F.2d 469, 472 (8th Cir. 1986). This Court also recognizes its obligation to "explain with particularity the reasoning and the subsidiary factual conclusions underlying its reasoning." Id.
[5] There is an inherent discrepancy in the data utilized by the parties in this case. Both sides rely upon census data from 1990, but superimpose upon those figures additional data known by the parties up to April 24, 1995.
[6] For additional history and background regarding the Plan, see generally Connealy v. Walsh, 412 F.Supp. 146 (W.D.Mo.1976.)
[7] Pursuant to Holder v. Hall, 512 U.S. 874, 884-86, 114 S.Ct. 2581, 2588, 129 L.Ed.2d 687 (1994), plaintiffs may not argue (and have not argued) that the number of judges in each of these jurisdictions should be increased so as to create smaller subdistricts for Voting Rights Act purposes.
[8] Mr. Hoskins was apparently referring to the selection commissions for trial (5 commission members) and not appellate (7 commission members) judges.
[9] The Court takes judicial notice of the fact that, shortly after the trial in this case, the Hon. Ronnie L. White, an African-American, joined the Missouri Supreme Court.
[10] Dr. Zemans acknowledged that "who picks the pickers" is a "critical question," but never, in all the states she has researched, has anyone (before now) suggested that the general electorate should be able to vote for attorneys who will, in turn, participate on a commission which will make a recommendation to the governor. Dr. Zemans testified that it makes sense for lawyers to be evaluating the ability of other lawyers to judge the potential of those who wish to be judges.

Dr. Zemans further testified that she did not believe that the system currently in place in Missouri has worked to the disadvantage of, or had a discriminatory effect on, minorities. She conceded, however, that the precise question of "who picks the pickers" was not a question that she and the American Judicature Society had "particularly examined."
[11] Dr. Zemans testified that, "both for women and minorities, the best way to the bench is through merit selection." She further testified that the American Judicature Society has conducted a number of studies regarding the opportunities for minorities and women, and has determined that merit selection is the best avenue to the bench, pure appointment is the second best, nonpartisan elections are third and, "the worst way is through partisan elections."
[12] Dr. Zemans testified to costs running into the millions of dollars for some elections.
[13] One implication of greater turnover is that, at any given time, more judges are on the front end of an extensive learning curve.
[14] As set forth in Connealy v. Walsh, 412 F.Supp. 146, 151 (W.D.Mo.1976), the State of Missouri has an "interest in promoting an independent judicial branch free from the appearance and the fact [of] influence of partisan politics. The nature and scope of this state interest can best be illustrated by review of the State of Missouri's long recognition that certain governmental functions can be properly performed and best performed only when free from the image and the fact of influence of partisan politics." The court went on to say that, "the integrity of the judicial system cannot be maintained unless it is free from the actual or apparent influence of politics. In Missouri, this is based upon a compelling state interest proven by experience and logic." Id. at 153.
[15] Indeed, Ms. Tyus testified that she participates in this process as a contact.
[16] The Missouri judiciary consists of the Supreme Court, three appellate districts, and forty-five judicial circuits. In terms of voting, however, the entire state is a "voting district" (when it comes to the Supreme Court), as is each appellate district, and each judicial circuit, in the same manner.
[17] In plaintiffs' post-trial brief they point out that many districts in the state with large populations still have judicial elections, and St. Louis County, the most populous circuit in the state, could always opt out. Plaintiffs thus contend that the size of a population in a district should not be considered a factor in favor of the Plan. Plaintiffs' point is well-taken, but the fact that elections are conducted in some jurisdictions is not evidence that a merit system would not work better in those jurisdictions.
[18] No evidence was presented to this Court documenting whether the St. Louis Argus, the St. Louis American or the St. Louis Star Times, or any other newspapers, were publishing in Missouri in the 1940s. The Saint Louis Globe-Democrat certainly was, however, and published articles regarding the Plan, as defendant's Exhibit L demonstrates by reference to same; but Ms. Beeman testified that she specifically did not attempt to obtain Globe-Democrat materials, because her search had been limited to the Post-Dispatch.

This Court finds Ms. Beeman's research, although lengthy, to be of minimal significance in resolving this matter. This Court cannot conclude that race was not a factor in creating the Plan based simply on the fact that one newspaper may not have mentioned race in their articles at the time. This Court cannot even conclude that Ms. Beeman read every article regarding the Plan which appeared in the Post-Dispatch between 1940 and 1945, because she only read those articles which were identified to her by yet another person as mentioning the Plan; there may have been more articles.
[19] In this regard, Judge Mason recommended straight demographic percentage distribution of the members of each commission. Stated plainly, if African-Americans represent ten percent of a given population, African-Americans should represent ten percent of the members of any judicial selection commission in Judge Mason's opinion.
[20] See text at page 17 regarding the subject matter of Dr. Weber's expert testimony.
[21] Dr. Zemans was certified by the Court as an expert on the history, operation, and results of merit selection and judicial selection in the United States.
[22] While it is arguable that any obstacle Missouri created for African-Americans who wished to attend law school in the 1940s adversely effected the number of African-Americans who did, in fact, attend law school, thus impacting the number of African-American lawyers in Missouri in the 1940s and 1950s, and thus limiting the pool of potential African-American judges at that time, and into the 1970s or 1980s, it is not necessarily so. Moreover, even if one assumes the foregoing, Missouri's misguided policy of not permitting African-Americans to attend the University of Missouri's law school in the 1940s does not account for the fact that in 1990 there were only 282 licensed African-American lawyers in the entire state.
[23] Plaintiffs offered no evidence regarding same.
[24] Bivariate ecological regression analysis, when used to analyze race, would take into account another factor at the same time, such as the city/suburb nature of the electorate. See Mallory v. Eyrich, 707 F.Supp. 947, 953 (S.D.Ohio 1989).
[25] Extreme case analysis means exactly what its name implies; one identifies precincts in the voting jurisdiction at issue which are ninety percent or more African-American and others which are ninety percent or more non-African-American. One then analyzes the behavior of these "extreme case" precincts as predictors of how the African-American or non-African-American populations will vote as a whole. Jenkins v Red Clay Consol. School Dist. Bd. of Education, 4 F.3d 1103, 1120 (3rd Cir.1993), cert. denied, 512 U.S. 1252, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994).
[26] This Court may, and does, take judicial notice of the value of standard deviation analysis. See Hazelwood School Dist. v. United States, 433 U.S. 299, 307-308 & n. 14, 97 S.Ct. 2736, 2741-42 & n. 14, 53 L.Ed.2d 768 (1977). When a litigant seeks to prove a point through the use of mathematics, he is subject to the principles of mathematics. See Moultrie v. Martin, 690 F.2d 1078, 1082 (4th Cir.1982). One of these principles is that the precision and dependability of statistics is directly related to the size of the sample (i.e., the greater the sample size, the greater the reliability of the analysis). Id. at 1082-83. The data in this case was drawn from large samples, thus leading this Court to find the results more reliable than it would if the same results had been calculated from small samples.

Standard deviation analysis requires two basic steps. The first is the collection of data and the application of a formula to that data to yield the value of "1 standard deviation." A standard deviation can have any value. The second step is to compare, in total standard deviations, how far off a particular number, or individual, or grouping, is from a norm. Total standard deviations of less than "2 or 3" are so small as to suggest randomness, and are therefore statistically insignificant. See id. at 1084-85. See also Waller v. Butkovich, 593 F.Supp. 942, 954-55 (M.D.N.C. 1984) (Standard deviation analysis applied in Jury Selection and Service Act case). Cf. African American Voting Rights Legal Defense v. Villa, 54 F.3d 1345, 1348, 1357 (8th Cir.1995) (Eighth Circuit, in the context of a Voting Rights Act case, wrote of a "standard deviation of 2.83" without indicating how it converted standard deviations to percentages), cert. denied, 516 U.S. 1113, 116 S.Ct. 913, 133 L.Ed.2d 844 (1996).
Of course, while the application of statistics gives this Court a more keen ability to interpret the data, the statistics themselves do not "prove" or dictate the outcome of this case.
[27] Dr. Weber defined strong cohesion as a condition where, in a two alternative race, one alternative achieves 80% or more of the vote of the group. Moderate cohesion is represented by 60-79% of the vote of the group.
[28] Racial polarization would be demonstrated if African-Americans voted cohesively one way while non-African-Americans cohesively voted for the alternative.
[29] Dr. Weber's position is supported by the case law. See e.g., Nipper, 39 F.3d at 1529; Magnolia Bar Ass'n, Inc. v. Lee, 994 F.2d 1143, 1149-50 (5th Cir.), cert. denied, 510 U.S. 994, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993); Mallory, 707 F.Supp. at 953. Thus, even if this Court assumes as fact plaintiffs' representation that blacks hold a significantly higher percentage of the elected executive and legislative offices in Kansas City and St. Louis than they do judgeships, this assumed fact is of minimal benefit to plaintiffs.

Moreover, the Gingles court recognized that incumbency is one of the special factors which must be taken into consideration when evaluating a section 2 case. "The unexciting nature (usually, at least) of judicial elections suggests that the effects of incumbency tend to be even more significant in judicial races than in legislative campaigns." Thompson, 935 F.Supp. at 1428. Insofar as every judge on the retention ballot is an incumbent and he or she is not even running against another person, this Court will limit its comparative analysis to the wealth of information presented to this Court on retention elections.
[30] This Court shall calculate both sets of figures, but it is plain that the ideal rate must be predicated upon those who may actually fill the slots. One must be a lawyer to become a judge. The ideal rate therefore must be dictated by the number of available lawyers. League of United Latin Amer. Citizens v. Clements, 999 F.2d 831, 865-66 (5th Cir.1993), cert. denied, 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994); Milwaukee Branch of the NAACP v. Thompson, 935 F.Supp. 1419, 1432 (E.D.Wis.1996).

The Court is aware of plaintiffs' desire to increase the number of African-Americans on the bench and their argument to that end. African-Americans have no "right," however, to hold 9.7% of the judgeships in the state of Missouri simply because African Americans represent 9.7% of the voting age population of the state.
Similarly, when analyzing the process which places attorneys on judicial nominating commissions, "[t]he number of minorities in the community at large is irrelevant .... When some specialized training is required for a position, the percentages relevant for statistical purposes are the percentages of qualified minorities." Back v. Carter, 933 F.Supp. 738, 756 (N.D.Ind.1996) (emphasis added). Thus, because the law requires that attorneys vote for and fill the slots for attorneys on the judicial nominating commissions at issue, this Court's focus shall be on the attorney numbers and ratios in this regard as well.
[31] The underlying numbers which were used in the equations come from the stipulated facts, facts adduced at trial, defendants' Exhibit K, and the official Manual for the State of Missouri (1993-94.)
[32] The State of Missouri requires its appellate judges to be residents of the appellate district they serve. Defendants thus contend that, because there were no black lawyers in the Southern District of Missouri, there could be no black judges in that appellate district.
[33] Plaintiffs, throughout this litigation, have been seriously concerned with the idea that it is statistically insignificant that no African-American sat on the Missouri Supreme Court at the time of trial. Plaintiffs also expressed disbelief in Dr. Weber's finding that the presence of African-Americans on the bench in the City of St. Louis, St. Louis County, and Jackson County represents a statistical over-representation of African-Americans in those locales.

It is not socially or philosophically insignificant that no African-American had made it to Missouri's highest Court by the day of trial. This Court acknowledges and shares plaintiffs' concerns in this regard, but these statistics are not a product of the Voting Rights Act being violated, or the Constitution being trammeled upon, by defendants. These statistics are also not the product of the University of Missouri's law school refusing to admit African-American law students half a century ago. These statistics are the product of the number of African-American men and women practicing law.
[34] Missouri has had four Constitutions, dated 1820, 1865, 1875, and 1945. The 1945 Constitution is presently in effect.
[35] This Court notes that a minimal amount of debate took place involving a minimal number of participants on June 6, 1944. This Court takes judicial notice of the fact that June 6, 1944, was D-Day, and the lack of interest in debate on that date may have been attributable to that fact.
[36] Section 2. Apportionment of Representatives

Representatives shall be apportioned among the several states according to their respective numbers.... But when the right to vote at any election of ... Judicial Officers of a State ... is denied ... or in any way abridged ... the basis of representation therein shall be reduced in the proportion which the number of such [] citizens shall bear to the whole number of [] citizens [18] years of age in such State.
[37] Plaintiffs identify four overlapping "causes of action" from which several issues may be gleaned. Although this Court now refers to plaintiffs' "causes of action," henceforth this Court will address plaintiffs' case issue by issue.
[38] This, despite the fact that the governor may decide to send the decision back to the commission. This Court nevertheless considers the entire package to represent an appointment by the governor since the appointment hinges on the decision of the governor, either to appoint directly or to allow the appointment of one of the three nominees to result from the commission's vote. Cf. Prewitt v. Moore, 840 F.Supp. 436, 439 (N.D.Miss.1993) ("limited `shift' in appointment powers" from governor to Chief Justice still an appointment, and is therefore a process which is not touched by the Voting Rights Act).
[39] This Court, as set forth in a variety of places in this memorandum, understands that the primary form of relief sought by plaintiffs is the conversion of certain multi-member judicial voting districts to several single-member judicial voting districts. Explicit in plaintiffs' complaint and other pleadings is the assertion that they seek a number of black-majority subdistricts as a result. Gingles therefore governs the analysis of same under the Voting Rights Act.

This Court does not understand plaintiffs' complaint or pleadings to assert that they seek "influence subdistricts," however. See West v. Clinton, 786 F.Supp. 803 805-806 (W.D.Ark. 1992) (recognizing theory that a minority group may have a right to subdistricts where minorities do not have a majority of the population, but they have a sizeable enough minority as to influence the outcome of any election in those subdistricts). Gingles does not govern any analysis of "influence subdistricts." 478 U.S. at 46, n. 12, 106 S.Ct. at 2764, n. 12. Similarly, if there are other remedial theories espoused by plaintiffs which do not involve subdistricting, the Gingles analysis would not be apropos. Plaintiffs have not identified what analysis would be apropos for their alternative remedies, however.
[40] Plaintiffs previously argued in their motion for summary judgment that Gingles is "irrelevant," and that League of United Latin American Citizens v. Clements, 986 F.2d 728 (5th Cir.1993) was "the controlling authority for the instant case." This LULAC panel decision was reversed by the Fifth Circuit, en banc, 999 F.2d 831 (5th Cir. 1993.)
[41] The reason for the cohesion element is that the plaintiffs have to prove that they at least have the potential to elect the representatives of their choice. If a minority group does not vote cohesively, it lacks the potential to beat a majority candidate absent special circumstances. The evidence as of April of 1994 was that the black communities in question in our state voted cohesively.
[42] Plaintiffs offered no evidence to dispute this testimony.
[43] Thus, as set forth in ง I.A., supra, while the Voting Rights Act cannot provide plaintiffs relief based on their allegation that they are discriminated against during any of the appointment processes now at issue, this Court will consider said allegation as part of the "totality of the circumstances."
[44] Plaintiffs' list is not without inconsistencies, however. Plaintiffs, for instance, included several cases which do not, as they allege, demonstrate official discrimination.
[45] Moreover, insofar as this Court today finds no violations of the Fourteenth or Fifteenth Amendments, plaintiffs' intertwined First Amendment allegations must fail as a matter of law. See Irby v. Virginia State Board of Elections, 889 F.2d 1352, 1359 (4th Cir.1989) ("In voting rights cases, the protections of the First and Thirteenth Amendments `do not in any event extend beyond those more directly, and perhaps only, provided by the Fourteenth and Fifteenth Amendments.'") (citations omitted).
[46] The Bolden decision prompted Congress to amend the Voting Rights Act to the extent that purposeful discrimination was no longer required to prove liability under the Act. Gingles, 478 U.S. at 43, 106 S.Ct. at 2762. Bolden remains good law with respect to allegations of constitutional infringement, however. See Davis, 478 U.S. at 127, 106 S.Ct. at 2808.
[47] This Court agrees with Judge Mason that, ideally, the Plan should facilitate the presence of a greater number of minorities on the nominating commissions, but this has no bearing on whether the Plan, as presently formulated, is unconstitutional.
[48] The existence of a "suspect class" has been recognized with respect to classifications based upon race, alienage, or ancestry. Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 312, n. 4, 96 S.Ct. 2562, 2566, n. 4, 49 L.Ed.2d 520 (1976).
[49] These cases may be further distinguished because the election of attorneys to selection commissions by other attorneys represents a "special unit with narrow functions" exception to the equal protection one-man, one-vote rule. Bradley, 916 F.Supp. at 1456-57, citing Ball v. James, 451 U.S. 355, 361-62, 101 S.Ct. 1811, 1816-17, 68 L.Ed.2d 150 (1981).
[50] There is a rational basis for the Plan in its entirety, and in its constituent parts, for the reasons set forth at pages, supra. (Additional Finding of Fact No. 13.)
[51] It is noted that while plaintiffs vociferously attack the fact that lawyers elect lawyers to the selection commissions, plaintiffs fail to mention that the governor appoints an equal number of lay people to the commissions. (See Post-trial Brief at pages 37-40.) The appointment of lay people to the commission eviscerates plaintiffs' reliance on Quinn v. Millsap, 491 U.S. 95, 109 S.Ct. 2324, 2332, 105 L.Ed.2d 74 (1989) and Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). Ours is not a case where every member of a board is required to own property. It is not, in point of fact, a case where every member of a board is required to be a lawyer.